[Crim. No. 23650. Feb. 28, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
LUTHER CLAYTON BROCK, Defendant and Appellant.

**COUNSEL**

Cecil L. McGriff, under appointment by the Supreme Court, for Defendant and Appellant.

David C. Coleman III as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, John B. Moy and David D. Salmon, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROUSSARD, J.**—Defendant appeals from a conviction of second degree murder and unlawful administration of methamphetamine. The principal

question on appeal is whether the trial court erred in allowing the prosecution to introduce the preliminary hearing testimony of a key witness who was unavailable to testify at the trial.

## I.

On August 15, 1980, a doctor examined Iris Southall and informed her that an abscess on her arm required surgery. Later that day she was admitted to San Francisco General Hospital and was assigned to a room with another patient, Mary Williams. Southall told the surgeon that she had given herself an intramuscular injection of amphetamines about three days earlier. Surgery was performed without incident from 10:15 to 11:15 p.m. The surgeon's examination of the patient both before and during the operation on the abscess revealed no symptoms of amphetamine intoxication or poisoning. The surgeon reexamined Southall in the recovery room shortly before midnight and again there were no symptoms of amphetamine intoxication.

An I.V. tube was placed in the patient's ankle through which she received penicillin and clindomycin. At 4 a.m., she was moved from the recovery room to the room she shared with Mrs. Williams. She was awake and alert and her vital signs were satisfactory. At 6:20 a.m., however, a nurse noted that Southall's vital signs had suddenly taken a turn for the worse. She could only be aroused with great difficulty. Her skin was cold to the touch and had a "bluish hue"—a condition known as cyanosis. The nurse summoned a medical intern, Dr. Shae Goldstein. Dr. Goldstein revived the patient and asked her if "any of her friends" had given her any drugs. The victim said only "yes" in response. Southall's condition continued to deteriorate and she was pronounced dead at 12:55 p.m. on the day following her surgery. The autopsy revealed extraordinarily high levels of amphetamine and methamphetamine in the decedent's blood.

On August 20, four days after the death, Inspector Napolean Hendrix of the San Francisco Police Department interviewed Mrs. Williams at the hospital. The inspector's notes from the August 20 interview stated inter alia: "Mrs. Williams told officers that on 8-15-80 prior to Southall going to surgery, she was visited by an NMA [Negro male adult] . . . [w]ho came into the room and talked with Southall until she left for surgery. Later after surgery, approximately 0400 a.m. the NMA returned and again talked with Southall. [¶] During the talk, the NMA asked Mrs. Williams for matches which she gave him. [¶] She then observed him to mix something in a container, then go to the area of Southall's feet. Mrs. Williams heard Southall say to the NMA, 'I don't see how shooting in my foot will help; I don't have a vein in my foot.' [¶] The NMA then told Southall, 'you have veins all over.' [¶] Mrs. Williams then heard what sounded like a syringe being

placed on a table. Later there was more conversation between the NMA and Southall. . . ."

According to Hendrix, he showed Mrs. Williams six photographs and asked her if she recognized anyone. On this point his notes stated: "Showed a group of six photos to Mrs. Williams and then she picked out the photo of Luther C. Brock. [¶] [Mrs. Williams] further stated that he was the NMA who was in the room and did something to the feet of Southall. [¶] Mrs. Williams further stated that Brock was wearing this same shirt in the photo that he was wearing while in 4B, 35." Mrs. Williams signed and dated the back of defendant's photograph as directed by Hendrix. At the conclusion of the interview the inspector signed the notes he had taken from Williams' statements. The notes were neither read nor signed by Mrs. Williams.

The account Williams gave Hendrix on August 20 was similar to the statement she had given San Francisco Police Officer Dennis Bonnel on August 16, the day of Southall's death, except for two significant discrepancies. She told Officer Bonnel that the man visiting Southall asked her for matches *before* Southall was taken to surgery. She also reported that *no words were spoken* between Southall and her visitor when he returned to the room around 4 a.m. Bonnel had been called to the hospital to investigate the circumstances of Southall's death. The notes from his investigation were incorporated into a police report before Inspector Hendrix visited Williams on August 20.

Defense counsel and a defense investigator taped a statement by Mrs. Williams on January 26, 1981. This third statement by Williams regarding the events in her hospital room adds further to the confusion created by her earlier contradictory statements to the police. The recording begins with Mrs. Williams' apparent reference to a conversation with Inspector Hendrix sometime in December 1980 in which she disputed the accuracy of his notes of her August 20 statement. Mrs. Williams stated: "I said, 'Well, I didn't say some of the things you guys wrote down on that there . . . .'" Mrs. Williams also reaffirmed her earlier report to Officer Bonnel that Southall's visitor asked for matches before the surgery: "That's when I give him the match, it was before surgery, they didn't take her out of there until about 9:20 for surgery and then bring back until 4:20." In another part of her taped statement, Mrs. Williams corroborated the other major observation contained in Bonnel's report of her August 16 statement. She stated that she "never heard a word" exchanged between Southall and her visitor about giving her drugs. In her most remarkable statement, Mrs. Williams indicated on the tape that after Southall left for surgery, she never saw the male visitor again.

The recorded statement also includes the following significant colloquy regarding Mrs. Williams' photo identification:

"[MR. DERISH, DEFENSE INVESTIGATOR] How did you identify Luther Brock from the police photos, how many sets of photos did they show you, Inspector Hendrix?

"[MRS. WILLIAMS] They showed me, you know, they take one sideways and one looking at you, I said, 'Now, I see so many of them look like him, but this guy had on a knitted cap,' I say, 'And this picture you have here, he's bare headed.'

"[MR. DERISH] But it was Mr. Brock, or Iris' boyfriend?

"[MRS. WILLIAMS] I couldn't swear it was, because someone tell you the truth, practically everybody you see on the street look just like him.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"[MR. DERISH] How many photos did Inspector Hendrix show you?

"[MRS. WILLIAMS] He just showed me one card.

"[MR. DERISH] One photo?

"[MRS. WILLIAMS] One card.

"[MR. DERISH] It was a side photo?

"[MRS. WILLIAMS] Just about that size.

"[MR. DERISH] He say there were six black fellows pictures that he presented to you.

"[MRS. WILLIAMS] He did not, he showed me one card, and it was about the size of this, if I make no mistake, this one on this side he was facing me and this one on that side—

". . . . . . . . . . . . . . . . . . . . . . . . . .

"[MR. McGRIFF, DEFENSE COUNSEL] Now you say you can't positively say that the picture Inspector Hendrix showed you was the person who was in the room that night?

"[Mrs. Williams] I told him so, I said the party that was in that room had on a, you know, these little knitted caps."

The preliminary hearing was held in four sessions between February 25, 1981, and March 9, 1981. The second of these sessions was held in Mrs. Williams' hospital room. The prosecution sought to establish the foundational elements of Evidence Code section 1237 in order to admit Mrs. Williams' August 20 statement to Inspector Hendrix as past recollection recorded.[1] By the time of cross-examination, Mrs. Williams' condition had deteriorated to such an extent that defense counsel terminated his examination after only three questions. He also moved to strike her testimony on the grounds she was incompetent to testify and denial of the right to cross-examination. The magistrate denied the defense motion and admitted Mrs. Williams' August 20 statement as past recollection recorded under section 1237. The August 20 statement was read into evidence by Inspector Hendrix. Mrs. Williams' statement to Officer Bonnel on August 16 was also admitted as past recollection recorded. Mrs. Williams' taped statement was admitted as a prior inconsistent statement under Evidence Code section 1235.[2] The defendant was held to answer.

An information was filed on March 23, 1981, charging defendant with one count of murder (Pen. Code, § 187) and one count of the unlawful administration of methamphetamine (Health & Saf. Code, § 11379). Prior convictions of manslaughter (Pen. Code, § 192) and being an ex-felon in possession of a firearm (Pen. Code, § 12021) were also alleged. Defendant moved to set aside the information under Penal Code section 995 claiming error in the admission of the August 20 statement. The motion was denied.

Mrs. Williams died sometime after the preliminary hearing and before the trial. In the trial court the prosecution moved *in limine* for admission of

---

[1]Evidence Code section 1237 provides: "(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:

"(1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory;

"(2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made;

"(3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and

"(4) Is offered after the writing is authenticated as an accurate record of the statement.

"(b) The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party."

[2]Section 1235 provides in pertinent part: "(a) Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing. . . ."

Mrs. Williams' August 20 statement under both the past recollection recorded and former testimony[3] exceptions to the hearsay rule. The prosecutor contended that Mrs. Williams' preliminary hearing testimony, together with the testimony of Inspector Hendrix, established the foundational requirements necessary for admission of her August 20 statement at the preliminary hearing as past recollection recorded. The prosecutor also claimed that Mrs. Williams' preliminary hearing testimony incorporating her August 20 statement was admissible at trial as former testimony under section 1291.

Defendant opposed the motion arguing that the magistrate had erred in admitting the August 20 statement at the preliminary hearing as past recollection recorded since the prosecution had not established the foundational prerequisites of section 1237. Defendant further argued that even if the August 20 statement had been properly admitted at the preliminary hearing, Mrs. Williams' preliminary hearing testimony was nevertheless inadmissible at trial since her disabilities at the time of the hearing deprived him of a meaningful opportunity for cross-examination. To support the latter claim, the defense called Mrs. Williams' treating physician at the time of the preliminary hearing to testify to her condition at that time.

The trial court ruled that Mrs. Williams' preliminary hearing testimony could be introduced at trial. The court concluded that "the parties had the opportunity, both the District Attorney and the defense to interrogate, to confront and to develop the testimony."[4] The court also ruled that Mrs. Williams' statements to Officer Bonnel on August 16, 1980, and to the defense investigator in January 1981, were admissible as prior inconsistent statements.

At trial, the prosecution introduced the August 20 statement as a part of Mrs. Williams' preliminary hearing testimony. The statement was read into

---

[3]The former testimony exception is codified in Evidence Code section 1291 which provides in pertinent part: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

[4]Although the opportunity for cross-examination is a foundational requirement for the introduction of former testimony under section 1291, the trial court never expressly cited the former testimony exception as the basis for its ruling. It is also somewhat unclear from the record how the court applied the past recollection recorded exception in ruling on the prosecution motion. In any event, it is apparent from the context of the hearing that the court had accepted the prosecutor's argument that the August 20 statement was properly a part of Mrs. Williams' preliminary hearing testimony as past recollection recorded, and that the testimony was admissible at trial under the former testimony exception. These two hearsay exceptions were the only bases cited by the prosecutor for admission of Mrs. Williams' preliminary hearing testimony and the testimony would not have been admissible under any other theory.

evidence by Inspector Hendrix and was the centerpiece of the prosecution's case. No other witness put the defendant in the victim's room after surgery.[5]

The defense theory was alibi. Defendant did not testify. A friend of both defendant and the victim testified that he and defendant went to the hospital about 12 or 1 a.m., but were unable to see the victim. This witness claimed he later dropped defendant off in the Hunter's Point area of San Francisco. Other witnesses testified that they were with defendant in the Hunter's Point area during the early morning hours of August 16. Defendant also introduced Mrs. Williams' statement to Officer Bonnel and her taperecorded statement to rebut Inspector Hendrix' notes of her August 20 account.[6]

Defendant was found guilty of second degree murder on count one and unlawful administration of methamphetamine on count two. Both prior convictions were found true.

## II.

On appeal defendant renews his claim that Mrs. Williams' mental and physical disabilities at the time of the preliminary hearing deprived him of an opportunity for meaningful cross-examination. After carefully reviewing all of the circumstances surrounding Mrs. Williams' preliminary hearing testimony, we agree with defendant's claim.

It is axiomatic that a criminal defendant has a fundamental right to confront the witnesses against him. (U.S. Const., 6th and 14th Amends.;

---

[5]A nurse identified defendant as the man she saw visiting Southall before surgery, but she never saw him again. Dr. Goldstein identified defendant as the man who came into Southall's room at the time the intensive care team was attempting to revive her and asked, "What happened to Iris?" She had not seen defendant in the room before this time. In arguing for the holding order at the preliminary hearing, the prosecutor described Mrs. Williams' August 20 statement as "the critical link that ties Mr. Brock to this case."

[6]The defense also disputed the coroner's conclusions regarding the cause of Southall's death and much of the trial involved testimony by prosecution and defense experts on how the death occurred. The coroner and other prosecution witnesses concluded that the cause of death was a massive overdose of amphetamines and methamphetamines injected through the I.V. bag sometime after surgery. Defense experts suggested the substance may have been present in Southall's blood as a result of metabolic acidosis, a process in which an increase in blood acidity draws out amphetamines stored in the organ tissue of chronic users. The autopsy showed Southall's blood was severely acidic and both amphetamine and methamphetamine were found in her organ tissue. She was also somewhat overweight, which would have meant greater storage of the drug and a greater likelihood of acidosis. Prosecution experts, however, did not believe acidosis could cause a leaching of amphetamine and methamphetamine at the levels found in Southall's blood. A second defense expert thought gas gangrene—an infection caused by the clostridium bacterium—to be the probable cause of death. This witness thought amphetamine poisoning to be the least likely cause of death. Prosecution and defense experts also disagreed about whether the morphine the patient received from hospital personnel in preparation for surgery and to relieve postoperative pain could have contributed to the complications which led to her death.

Cal. Const., art. I, § 15; Pen. Code, § 686.) It is equally well settled that the right of cross-examination is the primary interest secured by the confrontation guarantee and an essential safeguard of a fair trial. (*Pointer* v. *Texas* (1965) 380 U.S. 400, 405-407 [13 L.Ed.2d 923, 927-928 85 S.Ct. 1065]; *Douglas* v. *Alabama* (1965) 380 U.S. 415, 418-420 [13 L.Ed.2d 934, 937-938, 85 S.Ct. 1074].) ■ Of course, an adequate opportunity for cross-examination in an earlier proceeding may satisfy the confrontation clause even in the absence of physical confrontation at the time of trial. In *Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318], the United States Supreme Court recognized that "there has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." (*Id.*, at p. 722 [20 L.Ed.2d at p. 258].) In order to apply this exception the defendant's opportunity for cross-examination in the former proceeding must have been "complete and adequate." (*Pointer* v. *Texas, supra,* 380 U.S. at p. 407 [13 L.Ed.2d at p. 928].)

■ In *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930], the Supreme Court considered whether the trial court properly admitted the preliminary hearing testimony of the prosecution's key witness (Porter) when at trial the witness claimed a lapse of memory. The court found no error in the admission of the testimony based on the following safeguards: "Porter's statement at the preliminary hearing had already been given under circumstances closely approximating those that surround the typical trial. Porter was under oath; respondent was represented by counsel—the same counsel in fact who later represented him at trial; *respondent had every opportunity to cross-examine Porter as to his statement;* and the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings." (*Id.*, at p. 165 [26 L.Ed.2d at p. 501], italics added.) In the next paragraph the court emphasized the importance of an adequate opportunity for cross-examination by observing that defense "counsel does not appear to have been significantly limited in any way in the scope or nature of his cross-examination of the witness Porter at the preliminary hearing." (*Id.*, at p. 166 [26 L.Ed.2d at p. 501].) The *Green* court concluded that the right of cross-examination afforded at the preliminary hearing "provides substantial compliance with the purposes behind the confrontation requirement." (*Ibid.*)

California law is consistent with these principles. Evidence Code section 1291, subdivision (a)(2), creates an exception to the hearsay rule which permits the use at trial of former testimony of an unavailable witness provided "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given *and had the*

*right and opportunity to cross-examine the declarant* with an interest and motive similar to that which he has at the hearing.'' (Italics added; see also *People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73]; and *People* v. *Stritzinger* (1983) 34 Cal.3d 505, 515 [194 Cal.Rptr. 431, 668 P.2d 738].) It is firmly established that former testimony may be admitted under section 1291 only where the defendant had a meaningful opportunity to cross-examine the witness in the former proceeding.

In *People* v. *Gibbs* (1967) 255 Cal.App.2d 739 [63 Cal.Rptr. 471], the trial court admitted the preliminary hearing testimony of a prosecution witness who was unavailable at the time of trial. The Court of Appeal concluded that admission of the former testimony was reversible error because defendant's counsel had been appointed only five minutes before the preliminary hearing and was thus unable to conduct an adequate cross-examination. The court reasoned: ''Bare existence of an opportunity for cross-examination in a prior proceeding supplies only a limited indicator of the opportunity's adequacy. . . . The presence and participation of counsel . . . do not necessarily ensure the opportunity's adequacy. Qualitative factors play a role. The nature of the proceeding; the character of the witness and his connection with the events; the extent and subject of his direct testimony; the time and preparatory opportunities available to the accused and his attorney—these are some of the influential factors.'' (*Id.*, at p. 743.)

In *People* v. *Johnson* (1975) 46 Cal.App.3d 701 [120 Cal.Rptr. 372], defendant's conviction was based almost exclusively on the preliminary hearing testimony of a Spanish-speaking witness which was admitted at trial after the witness was shown to be unavailable. The trial court refused to admit defense evidence offered to impeach the interpreter's translation of the testimony given at the preliminary hearing. The Court of Appeal held that the trial court erred in rejecting the proffered impeachment evidence since it may have revealed inaccuracies in the translation. The court concluded that reversal of the conviction was required since any inaccuracies in the translation would have denied the non-Spanish speaking defendant ''a meaningful opportunity of cross-examination at the earlier proceeding.'' (*Id.*, at p. 704.)

In *Stevenson* v. *Superior Court* (1979) 91 Cal.App.3d 925 [154 Cal.Rptr. 476], the defendant was held to answer after a preliminary hearing, but was found incompetent to stand trial in a separate proceeding and was committed to Atascadero State Hospital. Defendant was later found competent and was remanded to superior court for a new preliminary hearing. At the new hearing, the magistrate admitted testimony given at the first preliminary hearing by a witness who was unavailable to testify at the second hearing. Defendant

was held to answer and petitioned for a writ of mandate/prohibition challenging the legality of the holding order. The Court of Appeal issued the writ after finding no meaningful opportunity for cross-examination at the first hearing. The court summarized its analysis as follows: "The appropriate test is not merely whether defendant was represented by counsel who had an opportunity to cross-examine the witness at the preliminary hearing. It must be determined whether there was a *real* opportunity of cross-examination. The test is not met when the defendant is incompetent at the time of the hearing where the testimony is given." (*Id.*, at p. 930, italics added.)

Several other courts have found no error in the admission of preliminary hearing testimony at trial only after determining that a meaningful opportunity for effective cross-examination existed in the earlier proceeding. (See *People* v. *Sul* (1981) 122 Cal.App.3d 355, 369 [175 Cal.Rptr. 893]; *People* v. *Maxwell* (1979) 94 Cal.App.3d 562, 572-573 [156 Cal.Rptr. 630]; *People* v. *Rodriguez* (1971) 18 Cal.App.3d 793, 797 [96 Cal.Rptr. 162]; *People* v. *Palacios* (1968) 261 Cal.App.2d 566, 574 [68 Cal.Rptr. 137].)

In order to apply these principles here it is necessary to examine the circumstances of Mrs. Williams' preliminary hearing testimony in some detail. Mrs. Williams was released from San Francisco General Hospital sometime between August and December 1980.[7] She was readmitted to the hospital in January 1981. It seems the primary reason for her admittance on this occasion was "anterior compartment syndrome." This condition required the amputation of her right leg approximately one month before the preliminary hearing.

Her doctor testified that at the time of the hearing Mrs. Williams "had a number of disease processes going on." The doctor also testified he suspected the patient had metastatic cancer and he was evaluating X-rays showing several scleratic lesions. Mrs. Williams had apparently been told by her doctors shortly before the hearing that her diseases were terminal.

Mrs. Williams was carried on a gurney into the hospital room which had been provided for the preliminary hearing. Her doctor testified later that she was "on quite a few medications," including two synthetic opiates, methadone and dilandid, and a sleep aid, dalmane, each of which has central nervous system effects. The witness had been given seven and one-half milligrams of methadone and six milligrams of dilandid at 10 a.m., approximately three and one-half hours before her testimony. She had taken dal-

---

[7]We have no information about what she was being treated for during her initial stay in the hospital, nor does defendant claim Mrs. Williams was incapable of perceiving the events in her room because of her condition at that time.

mane the night before. Mrs. Williams indicated to the magistrate that she understood the oath and was sworn. The magistrate suggested the prosecutor begin by laying a foundation regarding the witness' condition. The prosecutor rejected the suggestion with the terse reply, "Not through the witness, though." Since the prosecutor did not call any other witness to testify to the patient's mental and physical condition, the meaning of his comment is unclear.[8]

In view of Mrs. Williams' impaired state, the prosecutor was permitted to conduct his examination with leading questions. The court also restricted the defendant's right to object, although the magistrate indicated he would consider nunc pro tunc objections at the conclusion of the examination. Mrs. Williams' answers to the prosecutor's questions sometimes revealed signs of disorientation and confusion, while at other times her seemingly coherent answers were wildly inconsistent. She did, however, demonstrate a recollection of the context of her observations of the previous August. For example, she remembered the time of year she was in the hospital, the ward she was on, her various hospital roommates (including the victim), talking to Inspector Hendrix about what she had observed and identifying the photograph of a suspect.

Despite the court's admonition, defense counsel objected to the prosecutor's repeated use of facts not in evidence to preface his leading questions. Counsel also noted that no specific questions regarding the witness' observations had been asked. The court sustained the objection and suggested the prosecutor ask specific questions about what Mrs. Williams remembered observing in her hospital room the previous August. When the prosecutor resumed with a nonleading question, the witness became disoriented and in fact commented on her own mental state: "Q. Do you remember Iris going to surgery, do you remember that? [¶] I know you're thinking hard. [¶] A. No, I'm not thinking hard, I'm sick. [¶] Q. Let me ask you this question: do you remember anything at all that happened after Iris came into the room and you talked to her, do you remember anything at all? [¶] A. Not exactly crazy, but I'm trying my best to figure out what am I thinking. [¶] Q. Okay. [¶] A. I don't know nothing I could be thinking of, all during I was in the hospital."

The prosecutor tried again by asking whether Mrs. Williams could "remember anything at all of what happened with Iris?" She responded that she could not. In response to further questioning Mrs. Williams reaffirmed this answer by testifying that she specifically could not remember whether the victim went to surgery or whether Southall had received any visitors.

---

[8]Mrs. Williams' doctor was later called as a witness by the court.

Despite this testimony, the following colloquy occurred a few questions later: "Q. Do you remember at all if she had a black man who visited her in her room? [¶] A. There was a black man in there with her. [¶] Q. Do you remember when it was the black man was in the room?" Before she could answer, the prosecutor rephrased the question: "Q. Do you remember if the black man was visiting Iris before or after her surgery?" At this point defense counsel objected and the prosecutor rephrased the question again: "Q. [Do] you remember anything about the clothes that the black man had on, what kind of shirt he had on?["] A. I know he looked just like a man that had a suit, I don't mean suit, I mean he had a coat that he had on." Mrs. Williams had told Inspector Hendrix on August 20 that the man was wearing a Hawaiian shirt. When asked about the discrepancy, she indicated she didn't remember telling the police anything about a Hawaiian shirt.

The prosecutor also asked the witness if she remembered picking out a photograph of a suspect during the interview with Inspector Hendrix. In response, Mrs. Williams said, "I didn't pick out no one particular picture, it was just one picture."

On cross-examination defense counsel was able to ask only whether the witness remembered meeting with him on a prior occasion. At that point Mrs. Williams expressed discomfort and a recess was taken. During the recess her doctor tried to make her more comfortable. Both the doctor and the witness asked defense counsel how much longer the questioning would last. Counsel said he would try to make it as short as possible. When the cross-examination resumed, counsel was able to ask only two additional questions:

"[THE COURT] All right. Mr. McGriff is going to ask you a few more questions, Mrs. Williams, all right?

"[THE WITNESS] Yes, I'd be glad to ask [sic] questions if I can.

"[MR. McGRIFF] We appreciate it, Mrs. Williams.

"[MR. McGRIFF] Q. Do you remember the night that Iris was in the hospital, July—I mean August 15th?

"A. [Inaudible]

"[THE COURT] What did you say, Mrs. Williams?

"[THE WITNESS] I say I don't know, I've never answered.

"[THE COURT] You just don't know anything other than what you've already told us.

"[THE WITNESS] Right.

"[THE COURT] All right.

"[MR. McGRIFF] Q. Let me try to ask you, did you remember a black male visitor that visited Iris that night?

"[THE COURT] Are you thinking about it, Mrs. Williams?

"[THE WITNESS] Thinking about what? I don't know.

"[THE COURT] Did you forget that question? He asked you whether you remembered a black male visitor, coming to Iris' room that night. If you don't remember, you just have to say so, if you do remember, then tell us.

"[THE WITNESS] I can't remember no black male visitor.

"[THE COURT] She's indicated that she can't remember a male visitor coming to the room.

"[THE WITNESS] The only thing I can say is I just cannot, other than the next day when the other people began to come in, they come in asking me questions.

"[THE COURT] All right.

"[THE WITNESS] That's all I know.

"[MR. McGRIFF] I don't think there's anything further."

At this point the court called Dr. George Lampe, Mrs. Williams' treating physician. The doctor described her condition during the cross-examination: ". . . [S]he seemed to be very fatigued, was moving constantly on the gurney trying to get comfortable, looked extremely uncomfortable to me and just seemed really almost unable to respond to questions. She had forgotten she was even asked questions, seemed to be very fatigued." Dr. Lampe also testified that the synthetic opiates Mrs. Williams had been given "may have" affected her ability to recollect or relate events.

In response to questions from the prosecutor, Dr. Lampe admitted he had previously thought Mrs. Williams' condition would permit her to testify

truthfully and rationally. When questioned again by the court, however, the doctor indicated that in the preceding days Mrs. Williams had been more lucid and able to respond to questions than he witnessed at the preliminary hearing. He again testified that the witness' weakened and distressed condition may have affected her ability to respond to questions.

At the conclusion of the doctor's testimony the magistrate gave defense counsel an opportunity to make his nunc pro tunc objections with the following statement: "A couple of things I should put on the record at this time. . . . During the taking of the testimony of Mrs. Williams, because of her state of distress and some obvious pain, Mr. McGriff was not in a position to object to questions as he would normally be able to in a courtroom and accordingly, Mr. McGriff, if there are any objections to questions and answers, I think you should, within reason, be allowed to make them nunc pro tunc. I know there were a couple of times where you were beginning to object where I stopped you because I thought that the mere intrusion of a legal argument at that time might disorient the witness even further, so I think the record should reflect that."

Defense counsel moved to strike Mrs. Williams' testimony on the grounds that she was not a competent witness and that her condition deprived defendant of his right of cross-examination. The magistrate denied the defense motion, but acknowledged that the "opportunity [for cross-examination] was clearly curtailed by the fact that the witness, number one, her recollection was so hazy, and two, she seemed to be in pain, and as some questions were asked of her she appeared to drift and have trouble answering them." The magistrate also observed that although the witness remembered Inspector Hendrix and giving a statement, she had been unable to answer other questions because of a lack of memory and because of her mental and physical disabilities.

At the conclusion of the preliminary hearing the magistrate again acknowledged the witness' impaired condition and the restricted opportunity for cross-examination. ". . . I think you were severely handicapped in your interrogation of the witness, as was the prosecution, but the prosecution called her, got in a few questions which she seemed to be lucid enough to answer, then she was foggy and drifting off and incoherent at times and coherent at others, and I'm faced with the situation, Mr. Lassart [prosecutor], of either recognizing the handicap that counsel had in examining her, or invalidating all of her testimony on the grounds that there was not sufficient opportunity to recross-examine her, I have already made a finding that I found that the witness was competent to testify as to the fact that she had made statements and that they were accurate, and for that purpose admitted certain statements under 1237.

"That being so, I felt that it was my responsibility to indicate that *defense counsel was severely handicapped in the range and nature of his cross-examination.* The Court therefore has to draw some inferences, make some assumptions or invalidate the entire testimony of the witness, which I don't think is in the interest of justice under all of the circumstances, so that's why I have indicated that the general rules, strict rules of these sections cannot be applied with the exact precision they could be under other circumstances where the parties had all of the opportunities to explore inconsistencies to validate or invalidate prior statements and to have a clear and more thorough record that would be available."

Despite the magistrate's finding that defendant was severely restricted in his opportunity for cross-examination, he managed to save the testimony by "draw[ing] some inferences" and "mak[ing] some assumptions." Speculation by the trier of fact about how a witness might have testified had she been capable of responding to questions will not substitute for a meaningful opportunity for cross-examination. The record clearly demonstrates that by the time of the cross-examination Mrs. Williams had become so debilitated she was incapable of participating effectively in the proceeding. Her distressed condition made it necessary to interrupt the questioning after counsel's first inquiry. When the cross-examination resumed the witness failed to communicate an audible response. When the court asked what she had said, Mrs. Williams answered, "I say I don't know, I've never answered." The court then suggested a response which the witness adopted: "You just don't know anything other than what you've already told us?" When counsel tried to ask a second question, the witness failed to respond at all. When the court asked if the witness was thinking about the answer, it appeared she had forgotten the question had even been asked. With additional assistance from the court, Mrs. Williams again said she could not remember. Instead of attempting a third question, defense counsel terminated the cross-examination. Although defense counsel immediately moved to disqualify the witness, the motion was denied.

Our conclusion that the witness' condition precluded meaningful cross-examination is supported by her doctor's testimony both at the preliminary hearing and at the trial court hearing on the prosecutor's *in limine* motion. In the trial court Dr. Lampe essentially reiterated his preliminary hearing testimony although more forcefully than his occasionally equivocal testimony before the magistrate. For example, he testified that he noted a "marked difference" in Mrs. Williams' ability to respond to questions during the cross-examination versus her ability before the hearing. The doctor also testified that in his opinion Mrs. Williams' ability to communicate had been affected by her distressed condition and the medication she had ingested.

The witness' condition forced defense counsel to abandon significant opportunities to defeat introduction of her August 20 statement to Inspector Hendrix. Counsel was also foreclosed from any attempt to develop aspects of Mrs. Williams' direct testimony and prior statements which were favorable to the defense. At a minimum counsel could have attempted to refresh the witness' recollection with her own tape-recorded words, explored the inconsistencies among her three statements and her direct testimony, developed her crucial comments disputing Inspector Hendrix' version of her August 20 statement and examined the circumstances of her photo identification.

Cross-examination has been described as "the 'greatest legal engine ever invented for discovery of the truth.'" (*California* v. *Green, supra*, 399 U.S. at p. 158 [26 L.Ed.2d at p. 497], quoting 5 Wigmore, Evidence, § 1367.) Although the jury had the three contradictory statements before it, the fact remains that Mrs. Williams was never confronted with the contradictions in her recollection or examined at all with respect to the substance of the three statements. Without an adoption by Mrs. Williams of one of the versions of events, or at least an explanation of the inconsistencies, the jury had no basis for determining which of the statements was true.

Under these circumstances, we conclude that the trial court erred in admitting Mrs. Williams' preliminary hearing testimony at trial. The trial court did not even mention the severe restrictions on the defendant's opportunity for cross-examination which had so troubled the magistrate that he felt compelled to repeatedly acknowledge the defense "handicap" for the record. The court's assertion that "the parties had the opportunity, both the District Attorney and the defense to interrogate, to confront and to develop the testimony" flies in the face of the record.

It should be emphasized that an opportunity for meaningful cross-examination was particularly important in this case. Two hearsay exceptions were invoked to admit a statement of questionable reliability. Mrs. Williams never read the notes taken by Inspector Hendrix and she later claimed they inaccurately reported her observations. In her only tape-recorded statement, she contradicted every incriminating observation contained in the August 20 report. She also claimed she was shown only one photograph and could not say it portrayed the defendant. It is very possible that her memory would have been refreshed when confronted with her own words tape recorded only a little over a month before the preliminary hearing. Upon hearing the tape, she may very well have adopted the recorded statement as the true version of events. Unfortunately, her condition made it impossible to play the tape, or even to question her regarding the statement. The highly suspect August 20 statement, which constituted virtually the entire prosecution case,

was thus admitted at the preliminary hearing as past recollection recorded even though never subject to the test of cross-examination. The statement was then introduced at trial under the former testimony exception without any guarantees of trustworthiness.

We find the defendant was denied a meaningful opportunity for cross-examination as a result of the restrictions placed on the defense by the magistrate, and the limitations created by the witness' difficulty in communicating. The preliminary hearing testimony was therefore improperly admitted at trial under section 1291 and would not have been admissible under any other hearsay exception.[9] Since the prosecution case rested almost entirely on Mrs. Williams' former testimony, we find it reasonably probable that a result more favorable to the defendant would have been reached in the absence of the erroneous ruling. (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].)

## III.

Defendant also contends the evidence admitted at trial was insufficient to support his conviction. Because double jeopardy principles bar retrial after reversal for insufficient evidence, we must address this claim even though we reverse on other grounds. Although there were inconsistencies in the evidence, we must view the record in a light most favorable to the judgment and presume in support of the verdict the existence of every fact the jury could reasonably deduce from the evidence. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) We conclude that the evidence admitted at trial was sufficient to support the jury's finding of guilt beyond a reasonable doubt.

The judgment is reversed.

Bird, C. J., Mosk, J., Kaus, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

---

[9]The August 20 statement of Mrs. Williams could not have been admitted at trial as past recollection recorded under Evidence Code section 1237. Before a previously recorded statement can be admitted under that section, the declarant must testify that "the statement he made was a true statement of such fact." (See fn. 1, *ante.*) Our holding that Mrs. Williams' prior testimony was inadmissible necessarily means that the foundational elements of section 1237 could not have been established.