Filed 12/5/14  P. v. King CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B246794 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA049522) |
| v. | |
| THOMAS KING, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge.  Reversed.

Joseph S. Klapach, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Blythe J. Leszkay, and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

\*\*\*\*\*\*\*\*\*\*\*\*

This is Thomas King, Jr.'s second appeal. In the first appeal, we reversed his criminal convictions because he was prohibited from cross-examining D.N., the chief prosecution witness and only percipient witness, on the fact that she had been diagnosed with schizophrenia at a time close to the events underlying the convictions. We concluded that her diagnosis was relevant to her credibility and held that "[p]ermitting cross-examination on the issue of mental illness would have assisted appellant's right to confront and cross-examine D.N. as no other evidence bore on her ability to perceive the events" underlying appellant's convictions. (*People v. King* (May 10, 2012, B229834) [nonpub. opn.].)

Appellant was retried, and D.N. testified again, but appellant did not have the opportunity to cross-examine D.N. in the second trial. During her direct examination, D.N. recanted, identifying her assailant as someone other than appellant. But before she had a chance to explain why she recanted, she allegedly threatened to kill the prosecutor, invoked her right to remain silent under the Fifth Amendment, and was found unavailable to testify. Over objection, the trial court allowed D.N.'s testimony from the first trial to be read to the jury in the second trial. We conclude that introducing D.N.'s testimony from the first trial again violated appellant's right to confront D.N. We therefore reverse the judgment.

**FACTS**

### 1. *D.N.'s Testimony from the First Trial*

D.N. and appellant were friends, and D.N.'s daughter was appellant's ex-girlfriend. Appellant was not D.N.'s boyfriend.

At the time of the incident underlying appellant's conviction, D.N. was taking Xanax, Lotrimin, and Risperdal. The medication helped her sleep because it prevented her from hearing voices. It did not affect her memory.

On June 23, 2010, appellant knocked on her bedroom window because he wanted to watch a movie of a funeral. She let him inside. D.N. pretended to call her insurance agent to inquire how much money she would receive if she cashed in the life insurance

2

policies on her daughter and other family members in order to recover her jewelry from a pawn shop. D.N. did not actually speak to her insurance agent.

When appellant heard D.N. suggest she would cash in her daughter's life insurance policy, appellant repeatedly called D.N. a "mean old bitch." D.N. asked appellant to leave, and he took her cell phone and keys against her will. Appellant then retrieved a butcher knife from D.N.'s kitchen and cut the cord to two of her televisions, telling her she did not deserve them. Appellant threatened to take D.N.'s car to a place "where nobody can find it."

D.N. snuck in the bedroom and called 911. D.N. asked for help and then put the phone down and walked away. The 911 operator disconnected the call.

When D.N. told appellant she would call the police, appellant put hedge clippers around D.N.'s neck and threatened to chop off her head. Appellant dragged D.N. through the house with the hedge clippers for about four minutes. Appellant cut the cord to D.N.'s telephone and also threatened to kill D.N.

That same evening, appellant lit a broom on fire and told D.N. he would burn her face to make her ugly. D.N. tried to leave the house but appellant slammed the door shut, preventing her from exiting. Appellant moved the broom in circles, and D.N. fell to the floor to avoid the flames. Appellant's waiving the broom over D.N. resulted in several injuries including scars on her face, a singed eyebrow, burnt hair, and a burnt shoulder.

Under a ruse to get to a phone, D.N. requested appellant and she go to a store to purchase beer. D.N. drove appellant to the store. At the store, D.N. called 911 and stated appellant took her keys, phone, and burnt her with a broom. D.N. told the operator that appellant ran when he saw her on the phone. D.N. retrieved her cell phone and keys from appellant's home the next day.

### 2. D.N.'s Testimony from the Second Trial

Appellant was D.N.'s boyfriend (testimony different from her testimony during the first trial). William Brown was D.N.'s ex-boyfriend. Brown came to her house on June 23, 2010. D.N. had been hiding from Detective Berry for a week. Appellant knocked on her window and asked D.N. to let him inside.

3

Appellant was angry with D.N. because D.N. would not allow her daughter to live in her house, and because he thought D.N. was cheating on him with Brown. Appellant took D.N.'s cell phone and keys.

Appellant retrieved a knife from the kitchen and started cutting cords, including to the television. Appellant threatened to move D.N.'s car so that she could not locate it and said that God should have burnt down her house. Appellant put hedge clippers around D.N.'s neck.

In the middle of her testimony, D.N. stated, "[y]ou know, what? I'm sorry, ma'am, I can't take this. [¶] . . . [¶] . . . William did this. Now she's bringing up all this ugly stuff. He [appellant] didn't do that. I'm sorry. [¶] . . . [¶] . . . All I remember is Thomas, he never do this. He never hurt me." According to D.N., appellant never touched her and never touched the hedge clippers. Although D.N. previously testified that appellant was responsible, when she thought about it more she realized it was Brown. Brown lit the broom on fire, not appellant. D.N. testified her prior testimony was not true. Then D.N. told the prosecutor, "I'm going to the hospital. You can take me right now."

D.N. testified that she suffers from posttraumatic stress disorder and was diagnosed as having schizophrenia, and bipolar disorder with psychotic features. She testified she did not remember anything from the prior proceeding because at the time she was so stressed out.

D.N. did not complete her testimony because, as noted, after allegedly threatening to kill the prosecutor she invoked her Fifth Amendment right to remain silent.

### 3. Stipulation as to D.N.'s Mental State

The parties stipulated that on June 11, 2010, D.N. was diagnosed with and treated for schizophrenia and chronic paranoia.

### 4. Officer Jason Goedecke

Officer Goedecke responded to D.N.'s 911 call on June 23, 2010. D.N. had injuries to her face, left shoulder, and forearms. Goedecke testified that D.N. told him she was injured when appellant lit a broom on fire and hit her. Her forearms were burned

4

as she tried to protect her face from the lit broom, which appellant was swinging. Goedecke noticed that the left side of D.N.'s nose was red and one of her eyebrows was singed. D.N. did not have her car or house keys. D.N. told Goedecke that appellant had said "I'm going to fucking kill you, bitch." D.N. also told Goedecke that appellant cut the cord to the telephone when she threatened to call 911.

Goedecke went to appellant's home to investigate and heard appellant say, "mom tell the cops I'm not home." Appellant was found hiding inside a cabinet.

At D.N.'s house, Goedecke saw ashes in the entryway. He did not recall whether the house smelled like smoke.

### 5. *Deputy District Attorney Jonathan Chung*

Deputy District Attorney Jonathan Chung interviewed D.N. in connection with a different case involving appellant's brother. D.N. told him that appellant had injured her and pressured her to lie. D.N. said that appellant assaulted her, kicked her, beat her, set a broom on fire, and attacked her. According to Chung, D.N. told him that appellant cut the cord to D.N.'s telephone and to one or two of her televisions. D.N. also told Chung that appellant chased her around with hedge clippers and took her phone and keys.

### 6. *Deputy Sherriff Tyrone Berry*

Deputy Sherriff Tyrone Berry was assigned to a case involving appellant's brother and interviewed D.N. D.N. told him that her boyfriend had assaulted her and burned her with a kitchen broom.

### 7. *Dr. Jack Rothberg*

Dr. Jack Rothberg, a psychiatrist, testified for the defense. He had never met or evaluated D.N. He reviewed a hospital record identifying her diagnosis. According to him, schizophrenia is a major mental disorder characterized by problems in perception. Persons suffering from schizophrenia may have delusions, or may hear voices. Sometimes a person suffering from schizophrenia may remember his or her actions during an episode, and sometimes the person will not. A schizophrenic may hear voices. Some patients respond well to medication and others do not.

5

On cross-examination, Dr. Rothberg admitted he did not interview D.N. or anyone else who testified in this case. Dr. Rothberg did not listen to D.N.'s 911 call. But he opined D.N. may have been delusional even if she appeared to give specific details of an incident to a 911 operator. According to Dr. Rothberg, a schizophrenic's consistency in reporting an event was not indicative that the event actually occurred. A person may be coherent and still be delusional. Dr. Rothberg acknowledged, "I'm not really commenting specifically about Miss [D.N.]. I said nothing specifically about [D.N.]." Dr. Rothberg acknowledged he did not know if D.N. was delusional on June 23, 2010, or on any date she was interviewed or testified. Dr. Rothberg did not speak to D.N.'s treating psychiatrist and was not aware of any medication that she took.

## PROCEDURE

In a six-count amended information, appellant was charged with two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)),[1] criminal threats (§ 422), false imprisonment by violence (§ 236), dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)), and arson of the property of another (§ 451, subd. (d)). It was further alleged that appellant used a deadly weapon, to wit, a broom. Appellant was convicted of dissuading a witness from reporting a crime, misdemeanor unlawfully causing a fire (a lesser included offense of arson), battery (a lesser included offense of assault with a deadly weapon), and misdemeanor false imprisonment (a lesser included offense of false imprisonment by violence). With respect to the dissuading a witness count, jurors found true that appellant used a dangerous and deadly weapon. The court granted the prosecution's motion to dismiss the criminal threats allegation.

As noted, in the first appeal, we reversed appellant's criminal conviction because his right to confront D.N. had been violated. We concluded that appellant demonstrated he had been precluded from "cross-examining the chief prosecution witness and only percipient witness on the fact that she had been diagnosed with schizophrenia . . . ." (*People v. King, supra*, B229834.) We further concluded that her diagnosis was relevant

---

[1]     Undesignated statutory citations are to the Penal Code.

6

to her ability to perceive and her credibility. (*Ibid*.) We stated that "[p]ermitting cross-examination on the issue of mental illness would have assisted appellant's right to confront and cross-examine D.N. as no other evidence bore on her ability to perceive the events of June 23." (*Ibid*.)

Appellant was retried. Prior to trial at a hearing outside the presence of jurors, D.N. told the court that she did not wish to be there and stated, "I have the Fifth Amendment. I am not speaking. That's what I am going to do." The court ordered her to return. When the court ordered her to return, D.N. responded: "If I am not in the mental hospital, I'll be here. That's the problem. My issue, they are pressing me to do something I don't want to do. My therapist I go to and I told them I have post stress syndrome and I am very sick." The following colloquy ensued:

"The court: Do you understand that order, ma'am, to be here on September 26, 2012?

"[D.N.]: No. I am going. I don't understand. That's right. Yeah.

"The court: I didn't hear your response. Again, you interrupted the court. One more time and the last time: Do you understand that you are ordered to be in this court on the date of September 26, 2012, without any further order, notice or subpoena?

"[D.N.]: If I don't have a nervous breakdown by then, yes.

"The court: If you are not here on the next court date, if you are in the hospital, obviously, we can't send a police officer to arrest you. But you are ordered to be in this court, unless there is any legal cause why you are not here and you will be arrested on the warrant. So be here on --

"[D.N.]: Excuse me. I don't even know why I am here, what this is about. I don't even know.

"The court: I can't answer that question. All I know, Ms. [N.] --

"[D.N.]: "Well, I can't sleep behind -- you know, I have a problem with this.

"The court: Ms. [N.], don't interrupt this court, please.

"[D.N.]: I have to go on with my life."

Prior to trial, outside the presence of jurors, the court discussed D.N.'s testimony with counsel. The court indicated that D.N.'s psychiatric history was relevant to her credibility and her ability to recall. The court noted that the fact D.N. suffered from hallucinations and delusions was relevant to her perception of the events underlying the charges against appellant. The court concluded that defense counsel could question D.N. regarding her mental state at the time of the incident.

D.N. was called to testify. During direct examination, she described the events underlying this case and added several descriptions of her mental state, which were stricken. For example, after the prosecutor argued the statement was nonresponsive, the court struck D.N.'s statement that during the prior proceeding ". . . I might have told you that black was white and white was black because I was so messed up . . . ." Without stating its rationale, the court struck D.N.'s statement that she could not remember if she previously met the prosecutor because her "medication had me so messed up." When D.N. testified that appellant did not get the hedge clippers the court struck her testimony, finding it nonresponsive. The court struck D.N.'s testimony that appellant did not cause her thumb to bleed, finding it nonresponsive.

During the course of her testimony, D.N. became upset with the prosecutor and described the prosecutor as trying to "torture" her. The court took a recess. While the court was in recess, D.N. allegedly threatened to kill the prosecutor. The court then appointed an attorney to represent D.N., and D.N. invoked her Fifth Amendment right to remain silent. The trial court found D.N. unavailable.

Defense counsel did not move to strike D.N.'s testimony from the second trial. The prosecutor requested the court strike D.N.'s testimony from the second trial because the prosecution was not permitted to ask D.N. why she recanted. The prosecutor requested the court admit D.N.'s testimony from the first trial. Defense counsel objected to the admission of D.N.'s testimony from the first trial, arguing appellant's right to confront witnesses again would be violated by the admission of that testimony without the right to cross-examine D.N.

8

The court granted the prosecutor's motion to allow D.N.'s testimony from the first trial to be read to the jury. The court concluded that "there was an ability to fully confront and cross-examine the witnesses within the constraints of the prior court's ruling." The court further found appellant could introduce evidence regarding D.N.'s medical condition. The court did not strike D.N.'s testimony from the second trial. The court concluded the testimony should remain in the interest of justice as an inconsistent statement.

After the cause was submitted to the jury, jurors initially stated they were deadlocked on the false imprisonment charge. Eventually jurors convicted appellant of misdemeanor battery, misdemeanor false imprisonment, misdemeanor recklessly causing fire to the property of another, and dissuading a witness from reporting a crime with a deadly and dangerous weapon, to wit, a burning broom. The court sentenced appellant to a total aggregate term of six years.

## DISCUSSION

Although appellant contends several errors occurred, we address only his argument that he was denied the right to effectively cross-examine D.N. because that issue is dispositive. We first discuss general principles governing a defendant's right to confront witnesses against him. We then explain why appellant was denied the right to cross-examine D.N. In the final part, we conclude that admitting D.N.'s testimony from the first trial, prejudiced appellant.

A criminal defendant has the right, guaranteed by the confrontation clauses of both the federal and state Constitutions, to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Crawford v. Washington* (2004) 541 U.S. 36, 42; *People v. Wilson* (2005) 36 Cal.4th 309, 340.) "The right of confrontation 'seeks "to ensure that the defendant is able to conduct a 'personal examination and cross-examination of the witness, in which [the defendant] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is

9

worthy of belief.'" [Citation.] To deny or significantly diminish this right deprives a defendant of the essential means of testing the credibility of the prosecution's witnesses, thus calling "into question the ultimate '"integrity of the fact-finding process."'" [Citation.]'" (*People v. Herrera* (2010) 49 Cal.4th 613, 620-621.)

"Although defendants generally have the right to confront their accusers at trial, this right is not absolute. 'If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial.' [Citations.] The defendant 'must not only have had the opportunity to cross-examine the witness at the previous hearing, he must also have had "an interest and motive similar to that which he has at the [subsequent] hearing."'" (*People v. Seijas* (2005) 36 Cal.4th 291, 303.) Prior testimony is admissible only if the defendant "had a prior opportunity to cross-examine." (*Crawford v. Washington, supra*, 541 U.S at p. 59.)

"A witness may be cross-examined about her mental condition or emotional stability to the extent it may affect her powers of perception, memory or recollection, or communication." (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1072; see also *People v. Cooks* (1983) 141 Cal.App.3d 224, 302 [witness may be cross-examined regarding his or her mental condition when it affects memory or perception].) "'[E]xpert psychiatric testimony may be admissible to impeach the credibility of a prosecution witness where the witness' mental or emotional condition may affect the ability of the witness to tell the truth.'" (*People v. Herring*, at p. 1072.) Here, it is undisputed that evidence of D.N.'s mental state was relevant to her credibility—an issue we decided in the prior appeal.

*1. D.N.'s Testimony from the First Trial Should Not Have Been Admitted Because Appellant Was Unable to Effectively Cross-examine Her During the First Trial*

We held that during the first trial appellant's right to confront D.N. was violated. D.N. was assessed as suffering from paranoia, delusions, and hallucinations. (*People v. King, supra*, B229834.) At the first trial, the court did not allow questioning of D.N. as to whether she saw things that were not there. (*Ibid.*) We concluded that the limitation on cross-examination of D.N. violated appellant's right to confront the witnesses against

him.  (*Ibid*.)  We further concluded that "[p]ermitting cross-examination on the issue of mental illness would have assisted appellant's right to confront and cross-examine D.N. as no other evidence bore on her ability to perceive the events of June 23."  (*Ibid*.)

Because appellant was not able to effectively cross-examine D.N. during the first trial, her testimony during that proceeding should not have been read to jurors.  In *People v. Jones* (1998) 66 Cal.App.4th 760, 768, the court explained the relevant test:  "[T]o demonstrate that admission of the former testimony violated either the Evidence Code or the confrontation clause, it is not enough to show some violation of some constitutional right at the first trial; it must be shown the violation actually interfered with an effective cross-examination."  "What is crucial for purposes of both the former testimony exception and the confrontation clause is whether the previous opportunity for cross-examination was effective."  (*Id*. at p. 766.)  Here, appellant pointed out a deficiency in the cross-examination in the first trial.  Specifically, this court reversed his conviction because he had not been permitted to ask D.N. any questions about her mental state. Because the testimony in the first trial interfered with appellant's right to cross-examine D.N., the court should not have introduced that testimony in the second trial.

Our high court's decision in *People v. Brock* (1985) 38 Cal.3d 180 supports that conclusion.  In *Brock*, the Supreme Court held that it was error to allow the prosecution to admit preliminary hearing testimony of a witness when the defendant was denied the opportunity to effectively cross-examine the witness during the preliminary hearing.  The witness was ill and was unable to continue testifying at the preliminary hearing.  (*Id*. at p. 186.)  The court was concerned that although the witness provided contradictory statements she "was never confronted with the contradictions in her recollection."  (*Id*. at p. 197.)  The court held "the defendant was denied a meaningful opportunity for cross-examination as a result of the restrictions placed on the defense by the magistrate, and the limitations created by the witness' difficulty in communicating.  The preliminary hearing testimony was therefore improperly admitted at trial . . . ."  (*Id*. at p. 198.)

Like the defendant in *Brock* who was unable to effectively cross-examine the key witness during the preliminary hearing, here appellant did not have a meaningful

11

opportunity to cross-examine D.N. during the first trial. Also like in *Brock*, D.N. provided contradictory testimony and appellant did not have the opportunity to question her about why she identified Brown—not appellant—as her assailant. Nor did appellant have the opportunity to question her about the medications she took, or whether she suffered from hallucinations or delusions. D.N.'s testimony during the first trial was therefore improperly admitted.

Cases cited by respondent *Friend* (2009) 47 Cal.4th 1, 67, and *People v. Wilson, supra*, 36 Cal.4th at page 340 are not helpful in considering whether D.N.'s prior testimony was admissible. *Friend* stands for the general proposition that under Evidence Code section 1291, former testimony is not inadmissible if the declarant is unavailable and "'"[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."'" (*People v. Friend, supra*, at pp. 67-68.) *Friend* concerned whether a prosecutor exercised due diligence in locating a witness. In *Wilson* as in *Friend*, the defendant argued that the prosecution failed to exercise reasonable diligence to secure a witness's presence at trial. (*People v. Wilson, supra*, at p. 341.) Neither case involved facts or issues similar to this case.

In this case we need not determine whether expert testimony may substitute for cross-examination. Neither the stipulation D.N. suffered from schizophrenia, nor the admission of Dr. Rothberg's testimony was a substitute for D.N.'s testimony because the evidence did not bear on D.N.'s ability to perceive the events underlying appellant's conviction. Prior testimony is admissible only if the party against whom the testimony is offered had the opportunity to cross-examine the declarant. Here, appellant did not have that opportunity. The trial court erred in admitting D.N.'s prior testimony.

## 2. *Prejudice*

Respondent argues that any error was harmless because "unlike the situation at the first trial, the jury heard evidence concerning D.N.'s schizophrenia diagnosis and expert

testimony about the condition." Respondent also argues that it is unlikely D.N. would have had insight to testify meaningfully as to her mental status.

In this case Dr. Rothberg's testimony was not an adequate substitute for D.N.'s testimony because he never evaluated D.N. and limited his testimony to generic symptoms of schizophrenia. As the prosecutor repeatedly emphasized in her argument Dr. Rothberg's testimony did little to help jurors analyze whether the incident D.N. described actually occurred or was part of a delusion. As the prosecutor argued, "I don't know what [Dr. Rothberg] added to this case." Rothberg did not interview D.N. "Even though he testified, well, people suffer from schizophrenia and there's . . . varying degrees of their delusions. . . ." The prosecutor emphasized that Dr. Rothberg "couldn't give you an opinion as to whether [D.N.] . . . was delusion[al] or not on the date of this incident." "So for the doctor to get on the stand, say, well, she may have been delusional, clearly she wasn't." "I don't think the doctor's testimony really added anything . . . ."

Because the stipulation did not bear on D.N.'s ability to perceive jurors had no opportunity to evaluate that key question. No witness testified regarding the symptoms D.N. suffered. The stipulation did not negate the prejudice to appellant because he was not permitted to cross-examine D.N. on her ability to perceive, as the prosecutor's above-quoted argument emphasizes, that was the critical issue.

Respondent cites *People v. Gonzales* (2012) 54 Cal.4th 1234, 1263, for the proposition that D.N. would have little insight into her mental illness. In that case, our high court held that an eight-year-old child's grasp of psychological issues is necessarily limited. (*Ibid.*) In contrast here, D.N.'s testimony reflected some insight into her mental processes albeit in statements stricken by the trial court. D.N. attempted to explain that she was unable to think clearly when she testified in the prior trial because she was "messed up." She could not remember if she had met the prosecutor because her "medication had me so messed up." The record does not support the speculation that D.N. would have been unable to testify as to her mental state.

The evidence in this case was not so overwhelming that it is unreasonable to conclude cross-examination of D.N. would have altered the verdict. First, D.N. recanted.

13

While there may be other reasons for her identification of Brown as the perpetrator, the record at least would support a claim that she no longer believed appellant committed the crime. Although D.N. described the incident consistently, Dr. Rothberg testified that consistency was not probative of whether D.N. was delusional. Additional cross-examination may have effectively discredited D.N. In short, a reasonable jury might have received a different impression of D.N.'s credibility had cross-examination on her mental illness been permitted. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623-624.)

## DISPOSITION

The judgment is reversed.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.