[No. E015373. Fourth Dist., Div. Two. June 13, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY EUGENE MILLER et al., Defendants and Appellants.

## Counsel

Patrick Morgan Ford and John M. Bishop, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Frederick R. Millar, Jr., and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**RAMIREZ, P. J.**—A jury convicted Eric Hunter of conspiracy to commit willful, deliberate and premeditated murder with malice aforethought (Pen. Code, § 182) and Larry Eugene Miller of accessory after the fact (Pen. Code, § 32), as a lesser included offense of conspiracy to commit willful, deliberate and premeditated murder with malice aforethought. In bifurcated proceedings, the trial court found that each defendant had committed his crime for the benefit of a street gang. (Pen. Code, § 186.22, subd. (b)(1).) Both were sentenced to prison and appeal. Miller contends that his postarrest statements and the recordation of a witness's past recollection should not have been admitted. Hunter joins him in this latter argument. Miller also contends that the prosecutor engaged in prejudicial misconduct. We reject all these contentions and affirm Miller's conviction. Hunter additionally contends that the

jury was misinstructed as to the offense for which he was convicted. We agree with Hunter that the jury was misinstructed and therefore reverse his conviction, which moots his remaining contentions about another jury instruction error and insufficiency of the evidence as to the enhancement. We have responded to Hunter's contentions concerning the admission of the recordation of the witness's past recollection as an aid in the event of retrial.

## FACTS

Hunter and Miller, and other members of the Four Corner Hustlers, had been the recipients of a great deal of law enforcement attention at their customary hangout, an apartment complex in Lake Elsinore, in the weeks preceding November 1, 1993. Graffiti stating "187 em[,]" "247" and "Police[,]" the last of which had been crossed out, which meant to kill the police 24 hours a day, 7 days a week, had been put up with other graffiti in an area of the complex frequented by Four Corner Hustlers. A resident of the complex told police that weeks before November 1, she had overheard Hunter talking with other Four Corner Hustlers about shooting police officers. On November 1, a detective who had just gotten off duty and was on his way home in his own car and another detective in an unmarked police car were shot at as they drove past the complex. Another member of the Four Corner Hustlers admitted to being the trigger man. Although the People's theory was that Hunter also shot at the officers, in its findings as to the overt acts alleged with the conspiracy charge, the jury found that this was not true. After the shooting stopped, Hunter and others got into Miller's car and he attempted to drive out of the complex, but was stopped by the police.

## ISSUES AND DISCUSSION

### 1. *Admission of Evidence*

#### a. *Miller's Postarrest Statements*

█ Before trial began, Miller sought to prevent the prosecutor from introducing statements he made to the police during the first interview following his arrest on the ground that he had not been properly advised of his *Miranda*[1] rights. He contended that the officer who read him his rights informed him that anything he said "may," rather than "can and will" be used against him in a court of law. An evidentiary hearing was conducted, during which the officer testified that Miller was read the "can and will" language, rather than "may." At the conclusion of the hearing, the trial court

---

[1]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

made a factual finding that, despite some ambiguities in the officer's testimony, the officer had used the "can and will" language, and, therefore, Miller had been properly "Mirandized." Although Miller now seeks to contest the trial court's ruling, it is supported by substantial evidence, and, therefore, will be upheld. (*People* v. *Wash* (1993) 6 Cal.4th 215, 236 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

Miller also sought to prevent the prosecutor from introducing statements he made during a second interview with the police on the ground that he had not been readvised of his *Miranda* rights before this interview began. The first interview had started at 8:32 p.m. and had ended at 9:29 p.m. It took place in the detective bureau of the Lake Elsinore sheriff's station. A detective conducted it and a second detective was present and may have participated in it as well. Miller waived his rights and agreed to talk. After it concluded, Miller remained in the detective bureau, or may have been placed in the next room, where other suspects were waiting. The second detective testified that "We were . . . in the process of questioning people that were with [Miller] at the time."

The second interview began at 2:43 a.m. It also took place in the detective bureau and was conducted by the second detective. Miller never invoked his rights, had no hesitation in talking during the second interview and did not appear to be confused.

The trial court concluded that the second interview was reasonably contemporaneous with the first, finding that "the discussions with [Miller] were an ongoing process in which the officers continued to speak to [Miller] as to [his] . . . version[] of what occurred . . . ." Proper considerations in reaching such a conclusion are the amount of time which has passed since the earlier waiver of rights, any change in the identity of the interviewer, any official reminder of the prior advisement, the defendant's past experience with law enforcement, and any indication that he subjectively understands and waives his rights. (*People* v. *Mickle* (1991) 54 Cal.3d 140, 170 [284 Cal.Rptr. 511, 814 P.2d 290].)

Although Miller contests the trial court's conclusion that the second interview was reasonably contemporaneous with the first, he cites no decision in which the facts were at all similar to those here. Therefore, he fails to persuade us that the trial court erred in reaching its conclusion.[2]

---

[2]In his reply brief, Miller asserts that he was "the . . . target of a 'good-cop bad-cop' interrogation technique" which, he argues, was yet another circumstance demonstrating that the second interview was not reasonably contemporaneous with the first. Unfortunately for

### b. *Recordation of A Witness's Past Recollection*

A resident of the apartment complex where the shooting occurred testified as follows at trial:

"[The prosecutor:] Do you remember talking to [a detective] about overhearing a conversation that . . . Hunter had?

"[The witness:] He asked me various things that were being said on the day of the shooting, but not specifically before [the day of the shooting].

". . . . . . . . . . . . . . . . . . . . . . . . . .

"[The prosecutor:] Did you ever hear [Hunter] talking about shooting police officers prior to [the day of the shooting]?

"[The witness:] Specifically Mr. Hunter? No, I did not.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"[The prosecutor:] [D]o you recall on November 22nd talking with [the detective] . . . ?

"[The witness:] Yes.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"[The prosecutor:] Did you talk with him about hearing someone talking about shooting police officers?

"[The witness:] I believe I did.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"[The prosecutor:] What did you say?

"[The witness:] Presumably that there were several people there and that the conversation had gone . . . on the lines of shooting police officers.

"[The prosecutor:] Did you ever tell the . . . [detective] anything specific about . . . Hunter making statements?

Miller's position, there was no evidence adduced at the hearing as to what actually occurred during the interviews, aside from the facts already stated in this opinion.

"[The witness:] I don't remember if I made a specific statement as to who was talking.

"[The prosecutor:] Do you remember telling him that in the weeks before the shooting you specifically heard [Hunter] talking with other members of 4 C[orner ]H[ustlers] about shooting some cops?

". . . . . . . . . . . . . . . . . . . . . . . . . .

"[The witness:] No, I don't. I don't remember the conversation.

"[The prosecutor:] Were you trying to tell him the truth at that time?

"[The witness:] Yes, I was.

"[The prosecutor:] Do you remember saying that there were some specific names, but that you didn't recall who the names were?

"[The witness:] I don't recall if I mentioned any names at all.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"[The prosecutor:] . . . [B]efore the shooting, . . . did you overhear anyone else from 4[ ]C[orner ]H[ustlers] talk about shooting cops?

"[The witness:] There was always conversation about shooting police officers, but I don't remember any specific person making the statement.

"[The prosecutor:] Do you remember talking to me just a couple of minutes ago and saying there was an occasion when you were in the apartment and you overheard . . . voices, you couldn't say exactly who the person was—someone that you associated with 4[ ]C[orner ]H[ustlers][?] Do you remember that?

"[The witness:] Yes.

"[The prosecutor:] Do you remember saying that you heard them talking about them shooting cops?

". . . . . . . . . . . . . . . . . . . . . . . . . .

"[The witness:] Yes, I did.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"[Counsel for Hunter:] [Y]ou indicated several weeks prior to th[e shooting that] you had heard talk about shooting or getting a cop; correct?

"[The witness:] As I said before, there was always talk that way, but I believe that was the occasion that I have.

"[Counsel for Hunter:] That seemed to be just a regular topic, is it fair to say? From your perspective it seemed that these gentlemen hanging around there had problems with the police?

"[The witness:] Yes.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[Counsel for the third defendant:[3]] What you told us about that took place sometime before the shooting took place, people talking about shooting police officers— . . . I think you don't know specifically what individuals made some statements like that; is that correct?

"[The witness:] Yes, it is."

The witness explained that she did not contact the authorities to report the talk about shooting police officers "because there w[ere] never any specifics, no names, no direction, no place or city. [¶] A few of them [that were talking about this] I don't know if they were members [of Four Corner Hustlers] or not. It was just talk. There was nothing specific that could be used for a report."

The People sought to introduce the testimony of the detective who interviewed the witness on November 22 that the witness volunteered that she had been aware of threats concerning police officers prior to the shooting. She told the detective that during the weeks before the shooting, she had heard Hunter talking with other members of the Four Corner Hustlers about shooting police officers. Names of the law enforcement officers who were targeted were used, but she could not recall them. From her apartment, she overheard some Four Corner Hustlers talking about shooting any police officers. The People sought to introduce this testimony as a past recollection recorded, under Evidence Code section 1237.

Evidence Code section 1237 provides, in pertinent part:

---

[3]Like Hunter and Miller, he was charged with conspiracy to commit first degree murder, two counts of attempted murder and two counts of firing at an occupied vehicle. He was tried along with Hunter and Miller, and acquitted of all charges.

"(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:

"(1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory;

"(2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made;

"(3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and

"(4) Is offered after the writing is authenticated as an accurate record of the statement."

During an Evidence Code section 402 hearing, the detective who interviewed the witness testified that he recorded the witness's statements in a report in order to document them. He said that he took notes during his conversation with the witness, then wrote the report from the notes "up to a few hours" afterwards. He said that the report accurately depicted what the witness had said to him. He further stated that the witness did not appear confused during her conversation with him.

The trial court admitted the testimony, finding the lapse of time between the witness's overhearing the statements and her reporting them to the detective to be "the weak link," but, nevertheless, finding that her statements were credible and reliable and concluding that the requirements of Evidence Code section 1237 had been met.

■ The defendants contest the trial court's ruling. Although both assert that the evidence was also objectionable on a number of bases not advanced below, they are confined here to the bases they did assert. (Evid. Code, § 353.) One of these is the lapse of time between the overhearing of the statement and the report of it to the detective. In this regard, Miller cites no authority holding that such a lapse renders the statements inadmissible under Evidence Code section 1237. Hunter cites *People* v. *Brock* (1985) 38 Cal.3d 180 [211 Cal.Rptr. 122, 695 P.2d 209] and *People* v. *Simmons* (1981) 123 Cal.App.3d 677 [177 Cal.Rptr. 17], but neither case concerns this issue.

As to the other point he asserted below, that his opportunity to cross-examine the witness was infringed by admission of the testimony, Miller

cites *People* v. *Cummings* (1993) 4 Cal.4th 1233 [18 Cal.Rptr.2d 796, 850 P.2d 1]. However, *Cummings* does not assist his position.

Therein, the trial court admitted, under Evidence Code section 1237, the testimony of a detective as to his record of a conversation he had had with a jailhouse informant, during which the informant reported that the defendant had made incriminating statements. The informant "testified [at trial] that he had no recall of the conversations with [the defendant] or [with the detective], had been undergoing detoxification, was sometimes delusional, and was still having drug-related problems at the time of trial. He testified, however, that what he told [the detective] was the truth. He admitted that his motive for talking to [the detective] was to arrange a deal to get out of jail." (*People* v. *Cummings, supra*, 4 Cal.4th at pp. 1292-1293.)

The *Cummings* court held, "[The defendant] argues that the foundation for admission of the statement was inadequate since [the informant] could not testify that his statement to [the detective] was a true statement of fact. . . . [¶] The record does not support this claim. [The informant] testified that he spoke to [the detective] a few days after [the occasion for his conversation with the defendant], that the conversation he related was then fresh in his mind, and that he told [the detective] the truth. On cross-examination he accurately described the location [and conditions in which the conversation with the defendant had supposedly taken place]. [¶] . . . [W]hether an adequate foundation for admission of [the informant's] statement to [the detective] had been established turned on whether [the informant's] testimony that his statement was true was reliable. [Citations.] . . . [The informant] had sufficient recall of the events that the trial court had a sufficient basis for concluding that his testimony was reliable. The judge was aware that [the informant] had testified that he was delusional and did not know what the facts were, and had said that he did not recall . . . . We cannot conclude that [the trial court abused its] discretion in [concluding that the testimony was reliable. Its] conclusion that [the informant] testified truthfully and reliably when he said that his statement to [the detective] was true is supported by the record." (*People* v. *Cummings, supra*, 4 Cal.4th at pp. 1293-1294.) "Admission of evidence pursuant to Evidence Code section 1237 does not impermissibly deny defendants their federal Sixth Amendment or state article I, section 15 constitutional rights to confrontation and cross-examination if the record of the witness's past statement is properly authenticated and the statutorily required foundation for admission is laid.[4] [Citation.] [¶] [The defendant] not only was given the opportunity to, but did extensively, cross-examine [the informant]. [Citation.] The bias, lack of

---

[4]This covers Hunter's assertion that despite the admissibility of evidence under Evidence Code section 1237, his right to confrontation and cross-examination was still abridged.

recall, use of memory-affecting drugs, and all matters relevant to the credibility of the [informant], both at the time he made his statement and at the time of his testimony were fully explored. That is sufficient to satisfy the Sixth Amendment." (4 Cal.4th at p. 1292, fn. 32.)

Here, the witness acknowledged talking to the detective on November 22 and she asserted that she was trying to tell the detective the truth at that time.[5] She remembered discussing with him statements she overheard about shooting police officers; however, she was unable to recall if she told the detective that Hunter was one of the people who made such a statement. Despite her current lack of memory as to what she had told the detective regarding Hunter, there was a sufficient basis, as there was in *Cummings*, upon which the trial court could conclude that her statements to the detective were reliable and met the requirements of Evidence Code section 1237. As such, there was no violation of either defendant's rights to confrontation or cross-examination. As in *Cummings*, both defendants had a full opportunity to and did question the witness about her bias, lack of recall and other matters pertinent to her credibility.

## 2. *Jury Instruction*

 CALJIC No. 6.10 provides, in pertinent part: "A conspiracy is an agreement entered into between two or more persons with the specific intent to agree to commit the public offense of [murder] *and with the further specific intent to commit such offense*, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement. Conspiracy is a crime. [¶] In order to find a defendant guilty of conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one of the overt acts alleged in the [indictment] [information]. . . ." (CALJIC No. 6.10 (5th ed. 1988 bound vol.), italics added.)

This instruction was given to the jury, with the portion in italics omitted. Hunter contends that this omission constitutes error which requires reversal.

"To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but

---

[5]Neither defendant cites any authority that this is an inadequate basis upon which the trial court may find that the witness was telling the truth when she made the statements to the detective.

The parties do not cite any authority mandating that the witness must say the "magic words" that the statements by the defendant were fresh in their minds at the time they reported them in order for the trial court to conclude that the witness's statements were reliable. Here, the witness volunteered the information about the preshooting statements when the detective asked her about postshooting threats. Under the circumstances, the trial court was within its discretion in concluding that the statements the witness overheard were sufficiently fresh in her mind that when asked about a related matter, she volunteered the information.

also that *they intended to commit the elements of that offense.* [¶] . . . [¶] [T]he jury must also determine which felony defendants conspired to commit . . . . The jury cannot perform that task unless *it is instructed on the elements of . . . the offense* defendants are charged with conspiring to commit . . . . [¶] . . . To determine whether the object of defendants' conspiracy in the present case was the commission of a first degree murder, *the trier of fact obviously would need to know the elements of that offense.*" (*People* v. *Horn* (1974) 12 Cal.3d 290, 296-298 [115 Cal.Rptr. 516, 524 P.2d 1300], italics added and omitted, fn. omitted.)

In *People* v. *Marks* (1988) 45 Cal.3d 1335, 1345 [248 Cal.Rptr. 874, 756 P.2d 260], the California Supreme Court described the specific intent required of conspiracy to be "dual." Albeit dicta in *Marks*, the court observed that the same omission in the instruction on conspiracy that occurred here was error that should not be repeated upon retrial. More recently, in *People* v. *Swain* (1996) 12 Cal.4th 593, 600 [49 Cal.Rptr.2d 390, 909 P.2d 994], the California Supreme Court reiterated the language of *Horn* that " 'The specific intent required [for conspiracy to commit murder] divides logically into two elements: (a) the intent to agree, or conspire, and (b) the intent to commit the offense which is the object of the conspiracy. . . .' " In *Swain*, the court additionally described the mental state required for conspiracy to commit murder as "an intent to agree or conspire, *and a further intent to commit the . . . murder . . . .*" (12 Cal.4th at p. 602, italics added.) Therein, the court reversed a conviction for conspiracy to commit murder where it could not be determined that the jury found the requisite intent to kill. (*Id.* at p. 607.)

This jury was also instructed: "In the crime . . . [of conspiracy to commit willful, deliberate and premeditated murder, with malice aforethought] there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator. Unless such mental state exists, the crime to which it relates is not committed. [¶] In the crime of murder, the necessary mental state is malice aforethought." However, the jury instruction setting forth the elements of the crime of murder was not read or physically given to the jury with the instructions on conspiracy, but was with the instructions on the two attempted murders that were alleged and for which the jury found Hunter not guilty. This would not normally be cause for great concern, because the order of instructions is not determinative. (CALJIC No. 1.01.) However, here, the only instructions given at trial which defined

malice aforethought and premeditation and deliberation were expressly limited to the charged attempted murders.[6]

Argument by counsel did not help impress upon the jurors the conclusions they had to reach in order to convict Hunter of conspiracy to commit first degree murder. In this vein, the prosecutor said: ". . . [Y]ou . . . have to

[6]We recognize that there is some language in the California Supreme Court's recent opinion in *People* v. *Swain, supra,* 12 Cal.4th at page 606, which may be interpreted as meaning that the jury need not be informed of the requirement of the intention to kill nor given the definition of deliberate and premeditated, i.e., " ' "[A] conspiracy to commit murder can only be a conspiracy to commit murder of the first degree for the obvious reason that the agreement to murder necessarily involves the 'willful, deliberate and premeditated' intention to kill a human being." ' . . . [¶] . . . [¶] [N]othing in the court's decision in *Horn* suggests that conspiracy to commit murder can be committed without intent to kill . . . ." The holding in *Swain,* which gives proper context to these statements, is that there is no such offense as conspiracy to commit second degree murder on an implied malice theory. Also along these lines, the *Swain* court noted, "[T]he rationale of *Horn* . . . would no longer afford any principled basis on which to distinguish between the mental state required for conspiracy to commit murder; the specific intent to agree and conspire *with intent to kill*—and the mental state of premeditated first degree murder. Stated differently, conspiring to murder *with the requisite intent to kill* is arguably functionally indistinguishable from the mental state of premeditating the target offense of murder." (12 Cal.4th at pp. 608-609, italics added and omitted.) First, these remarks were made in the context of the court's discussion whether there existed the offense of conspiracy to commit second degree express malice murder, a matter the court did not resolve. It is also noteworthy that although, arguably, the requirements of premeditation and deliberation may be dispensed with, the necessity of the intent to kill may not.

Unless and until the California Supreme Court holds that a jury need not be informed of the necessity of finding the intent to kill and of the definition of deliberate and premeditated as to a charged conspiracy to commit first degree murder, we will adhere to the position stated herein.

In his argument to the jury, the prosecutor correctly stated, "[Y]ou have to understand what murder is in order to determine whether or not this conspiracy to commit murder occurred.

" . . . . . . . . . . . . . . . . . . . .

"[I]n order to find a murder you would have to find that a human being was killed, that the killing was unlawful, and that it was done with malice aforethought. . . . [¶] Malice aforethought is . . . an intent to kill. . . .

" . . . . . . . . . . . . . . . . . . . .

"[F]irst-degree murder is murder that is willful, deliberate, and premeditated. Willful means intentionally. [¶] Deliberate means the result of a careful thought and weighing of considerations."

While we have no trouble utilizing the argument of counsel to help clear up *ambiguities* in instructions given, there is no authority which permits us to use argument *as a substitute for* instructions that should have been given. Logically, this is so, because the jury is informed that there are three components to the trial—evidence presented by both sides, arguments by the attorneys and instructions on the law *given by the judge.* Jurors are told that their decision must be based on the facts and the law and if counsel says anything that conflicts with the instructions that are given by the judge, they must follow the instructions.

We are puzzled by the People's assertion during oral argument that the instructions on malice aforethought and premeditation and deliberation were not expressly confined to the charged attempted murders. Clearly, they were.

pay attention to what it is that does make a conspiracy. A conspiracy is an agreement. In order to prove the crime of conspiracy, you have to show that there's an agreement between two or more persons with specific intent to commit a public offense. [¶] And that's element No. 1. [¶] Element No. 2, an overt act by one or more of the parties intended to accomplish the object of the agreement." Miller's argument to the jury, which was equally unhelpful in this regard, was: "And I don't have any quarrel with what [the prosecutor's] charts explain to you with respect to what the law is as to a conspiracy. You need two elements. You need (1) an agreement, and (2) you need an act in furtherance of that conspiracy, and, of course, the agreement has to be to commit some unlawful act. [¶] So you need basically two elements, the agreement and the act."

What this jury did, then, was to decide that Hunter conspired to commit deliberate and premeditated express malice murder, without being told that Hunter needed to have intended to kill the officers and without being given the definition of deliberate and premeditated.[7] Under the authorities cited above and in light of the ambiguity created by the California Supreme Court's most recent pronouncement on the applicable standard for omitted jury instructions, or portions thereof (see *People* v. *Kobrin* (1995) 11 Cal.4th 416 [45 Cal.Rptr.2d 895, 903 P.2d 1027]), we conclude that even under the harmless beyond a reasonable doubt standard, reversal is required. Here, based on the failure to require a finding of intent to kill and to define deliberate and premeditated, we cannot say beyond a reasonable doubt that the omissions had no effect on the jury's verdict. (*Id.* at p. 430.) Therefore, Hunter's conviction for conspiracy to commit first degree murder must be reversed.

## 3. *Prosecutorial Misconduct*

### a. *Moral Certainty*

■ In responding to argument by the third defendant[8] concerning reasonable doubt, the prosecutor said: "He talks about moral certainty, and that's a phrase which . . . quite honestly . . . is a phrase that has undergone some criticism in court." All three defense counsel objected and the trial court sustained their objections. Miller moved for a mistrial, which the trial court denied, instead, instructing the jury: ". . . [The prosecutor] made a comment about criticism of the reasonable doubt standard which is contained in CALJIC. 2.90, which is the instruction which I will provide to you

---

[7]We disagree with the People's contention that instructing the jury that Hunter had to have "the specific intent to agree to commit . . . murder" made clear to the jury the dual aspect of the intent requirements. Simply stated, it did not.

[8]See footnote 3, *ante*.

later and which . . . is the law in the State of California. [¶] At this time I am going to grant a motion to strike his comment concerning criticism of that standard from the record. [¶] I am going to further admonish you to disregard that one statement made by [the prosecutor] and to not allow it to enter your deliberations or discuss it in any way. Does everybody understand that admonishment?" The jury indicated that it did. The prosecutor immediately stated: "Please understand, I didn't finish my sentence, I . . . want you to follow the law. You have to follow the law. I am not doing my job if you don't follow the law." He then went on to address the concept of moral certainty.

The trial court later instructed the jury, "You must accept and follow the law as I state it to you, whether or not you agree with the law. If anything concerning the law said by the attorneys in their arguments . . . conflicts with my instructions on the law, you must follow my instructions."

Assuming, for the sake of argument, that the prosecutor's initial comment constituted misconduct, the test is whether it is reasonably likely that the jury construed or applied the comment in an objectionable fashion. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40].) Given the trial court's admonition and later instruction, the prosecutor's follow-up statement, and the fact that this jury acquitted the third defendant of all the charges against him and Hunter and Miller of all but one,[9] we are persuaded that the jury did not construe or apply the remark in an objectionable fashion.

b. *Miller's Failure to Testify*

■ During his argument to the jury, counsel for Miller read CALJIC No. 2.60, forbidding the jury from drawing any inference from, discussing or considering the defendant's failure to testify. He also read CALJIC No. 2.61, which provides, inter alia, that in deciding whether to testify, the defendant may rely upon the state of the evidence and upon the failure of the People to prove every essential element of the crimes charged beyond a reasonable doubt. He then asserted, "Mr. Miller has the right to come into this courtroom and say, 'People, prove the charge.' [¶] The burden of proof is on the prosecution. [¶] They have to come forward with the evidence. Mr. Miller can simply sit back and say, 'prove it,' and if they don't prove it, he doesn't have to put on any evidence." He went on to argue that the People had not proven their case against Miller.

During closing argument, the prosecutor attempted to respond to this by saying: "[Counsel for Miller] read you the instruction regarding the fact that

---

[9]See footnote 3, *ante.*

his client didn't take the stand to testify, and that is an appropriate instruction to give. [¶] But something that he asked you to do is not right. He asks you to speculate. He asks you to speculate that the only reason—and I am not suggesting that there is any other reason, but he wants you to speculate the only reason . . . Miller might have for not testifying is evidence, evidence of . . . Miller's— [¶] . . . opinion of the People's case, that the People's case is insufficient."

Miller objected and requested an admonition to the jury. The trial court gave the jury the following, without objection by Miller, ". . . [The prosecutor] was in some manner referring to the fact that Mr. Miller . . . did not testify. And I am going to direct you to disregard [the prosecutor's] comments as to any possible reason why . . . Miller did not testify, and I will later read you two instructions specifically with regard to the fact that [he] did not testify." The trial court later read CALJIC No. 2.60 and CALJIC No. 2.61 to the jury.

Miller now contends that the prosecutor's remarks constitute *Griffin*[10] error, i.e., commentary on the defendant's failure to testify. What the prosecutor's remarks boiled down to was a suggestion that there may be a reason Miller did not testify other than his conclusion that the case against him was weak. The remarks did not invite the jury to draw an inference harmful to Miller based on his failure to testify. Again, for purposes of argument, we will assume that *Griffin* error occurred.

In determining the degree of prejudice flowing from *Griffin* error, " 'we must focus upon the extent to which the comment itself might have increased the jury's inclination to treat the defendant's silence as an indication of his guilt. . . . A forbidden comment . . . is less likely to affect the "substantial rights" of a defendant . . . if that comment merely notes the defendant's silence and includes no suggestion that, among the various inferences which might be drawn therefrom, those unfavorable to the defendant are the more probable. . . .' . . . [¶] . . . [¶] . . . Moreover, the trial court, at defendant's request, promptly admonished the jury and carefully explained to them that no adverse inferences were to be drawn from defendant's silence. [¶] . . . [¶] The cases which have considered the prejudicial effect of errors similar to those committed in the instant case almost uniformly have found those errors to be harmless. . . . [¶] . . . [¶] This court has stated that, in order for *Griffin* error to be prejudicial, the improper comment . . . must either 'serve to fill an evidentiary gap in the prosecution's case,' or 'at least touch a live nerve in the defense . . . .' " (*People* v. *Vargas* (1973) 9 Cal.3d 470, 478-481 [108 Cal.Rptr. 15, 509 P.2d 959], italics omitted.)

---

[10]*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].

In *People* v. *Hovey* (1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776], the California Supreme Court concluded that the prosecutor's remarks constituted *Griffin* error; however, "as we . . . stated in . . . *Vargas*, indirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error." (Accord, *People* v. *Mincey* (1992) 2 Cal.4th 408, 446-447 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

The remark here, like those in *Hovey*, was indirect, brief and mild and contained no suggestion that an inference of guilt be drawn from Miller's failure to testify. The remark did not serve to fill an evidentiary gap in the People's case, nor did it touch a live nerve in the defense, as *Vargas* addresses. Additionally, the trial court "undid" the remark by its admonition and reiterated the instructions to which Miller's counsel had originally called the jury's attention. Under the circumstances, any error was harmless beyond a reasonable doubt. (*People* v. *Hovey*, *supra*, 44 Cal.3d at p. 572.)

### DISPOSITION

The trial court is directed to amend the abstract of judgment for Miller to reflect the fact that he was convicted by *jury* trial, rather than *court* trial, as the abstract currently states. In all other respects, the judgment as to Miller is affirmed.

The judgment as to Hunter is reversed.

McKinster, J., and McDaniel J.,* concurred.

Respondent's petition for review by the Supreme Court was denied September 25, 1996.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.