Filed 12/21/15  P. v. Gutierrez CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040904 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS132424A) |
| v. | |
| SYLVESTER GUTIERREZ, | |
| Defendant and Appellant. | |

## I.     INTRODUCTION

Defendant Sylvester Gutierrez appeals after a jury convicted him of inflicting corporal injury on a cohabitant (Pen. Code, § 273.5, subd. (a))[1], battery on a person with whom he had a dating relationship (§ 243, subd. (e)(1)), and 20 counts of violating a protective order (§ 166, subd. (c)(1)).  Defendant had previously pleaded no contest to several other charges.  The trial court found true an allegation that defendant had a prior conviction of assault with a deadly weapon, which qualified as a strike (§ 1170.12, subd. (c)(1)), and it imposed an aggregate prison term of seven years four months.

Defendant's domestic violence convictions were based on an incident involving his former girlfriend, Jane Doe.  Doe had reported the incident in a 9-1-1 call and in a

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

police interview, but at the preliminary hearing, she recanted. At trial, Doe was found unavailable and did not testify, but her preliminary hearing testimony was introduced into evidence, along with her 9-1-1 call and the statements she made during the police interview.

Following the domestic violence incident, a protective order was issued; it prohibited defendant from contact with Doe. The charges of violating a protective order were based on a number of phone calls and visits between defendant and Doe while defendant was in jail. Several of the jail phone calls were introduced into evidence at trial.

On appeal, defendant challenges the admission of Doe's preliminary hearing testimony, police interview statements, and 9-1-1 call. He also challenges the admission of the jail phone calls. Defendant further contends there was insufficient evidence to support the jury's finding that Doe was a cohabitant of defendant, and that there was insufficient evidence to support the trial court's finding that defendant's prior assault conviction was a strike. We find no merit to these claims and will therefore affirm the judgment.

## II. BACKGROUND

### A. *Domestic Violence Incident*

On June 1, 2013, Jane Doe called 9-1-1 from outside the police station. She told the dispatcher she wanted to report "a domestic violence." She reported that the incident had been "very physical" and that she had bruises on her face. Doe said she did not need an ambulance, explaining, "I'm fine. A little shaken up, that's all." When asked when the incident had occurred, Doe responded, "Today, earlier today. It's . . . it's been . . . it's been happening off and on, and I never really reported it." She named defendant as the perpetrator and began crying. Doe explained that she and defendant had been arguing,

2

and that defendant had "just started hitting [her]" while they were in his sister's car. Doe continued crying as she described the incident.

Salinas Police Officer Robert Zuniga responded to Doe's 9-1-1 call. Officer Zuniga met Doe outside of the police department at 11:44 a.m. and then brought her inside, where he interviewed her. Doe was crying, and her eyes were red. She had "significant injuries to her face." Specifically, she had "significant bruising" on the left side of her face underneath her eye, which was beginning to cause discoloration. Doe told Officer Zuniga that defendant had slapped her in the face and struck her multiple times earlier that morning. Defendant had been telling her to "look him in the eyes," and she had not. Doe said she was afraid of defendant because he had assaulted her on prior occasions.

According to Doe, the incident had occurred in defendant's vehicle, which had been parked in front of defendant's residence. The incident had begun at about 10:00 a.m. and had continued until around 11:30 a.m. During the incident, defendant had taken Doe's phone and purse. After the incident, defendant had said to Doe, "Look what you did. This is your fault. Now we can't be together." Defendant had then left to go buy cigarettes.

Following the incident, Doe went into defendant's residence and showed his sister her injuries. Doe's mother also observed Doe after the incident. Doe had a black eye, a bruise on her arm, and bruises on her hands and wrist.

### B. Firearm, Ammunition, and Resisting Incident[2]

After Doe's interview, police officers went to defendant's home. On the way there, the officers saw defendant and stopped to contact him. Defendant fled and was observed taking a black object out of his waistband. The officers deployed their Tasers

---

[2] The facts relating to these counts are taken from the probation report.

on defendant and found that he was in possession of a stolen handgun and three magazines loaded with .22-caliber ammunition.

### C. *Violations of Protective Order*

A protective order prohibiting defendant from contact with Doe issued on June 11, 2013.

Doe visited defendant in jail on September 14, September 21, October 12, and November 2, 2013. Defendant called Doe from jail on June 1, June 2, and June 3, 2013, and he called her 23 or 24 times from September 5, to November 10, 2013.

Transcripts from several of the jail calls were introduced into evidence. In a call on June 1, 2013, defendant told Doe, "They got me," and asked her, "Are you happy now?" Defendant told Doe that she could have said that her fight had been with a woman named Becky. Defendant told Doe that he loved her. Doe said that she loved him too and that "[t]his is not what I wanted to happen at all." Defendant and Doe apologized to one another. Defendant acknowledged that he had "made a mistake." Doe referred to what defendant had done to her face and asked, "Why did you hurt me?" Defendant responded, "Because I love you so much, and it hurts me." Defendant referred to Doe having disrespected and deceived him. Doe informed defendant that she had told the police he had slapped her. Defendant responded, "So then you told them that I did something."

In another call, Doe told defendant that she had gone to the police station after the incident because she was tired of him hitting her. She told defendant that he had hurt her "bad this time" and that her whole face was numb. Defendant responded, "Numb?" Defendant told Doe that he felt "betrayed" by her. Doe later reiterated that she was in pain and that her whole face was sore. She reminded defendant that he had hit her and asked, "[H]ow was that anything different?" Defendant responded, "You forget what you told me earlier?"

4

In a third call, defendant told Doe that he needed to know whether to prepare to let her go, and he asked if Doe was going to show him that she loved him or show him that she did not.  Doe asked how defendant wanted her "to show it" and suggested he meant "[t]o be by your side or whatevers."  Defendant agreed.

In a fourth call, defendant asked Doe if she was going to "try to make things better?"  Doe asked how to do that.  Defendant indicated Doe should show him "that you're really tryin' to get me outta here."  Doe indicated that she was scared, "tired of getting beat up" by him, and tired of him hitting her.  Defendant responded, "Are you looking at what you're do[ing]?"

### D.      Doe's Preliminary Hearing Testimony

Doe testified at defendant's preliminary hearing, which was held on December 13, 2013.  Her preliminary hearing testimony was admitted at trial.

As of June 1, 2013, Doe had known defendant for a year.  Doe acknowledged that she had made a police report regarding an injury to her face, but when asked why, she replied, "I don't know.  I don't know.  I don't recall."  Doe testified she had gone to the police department "for advice" on "[r]elationships."  The trial court then permitted the prosecution to treat Doe as a hostile witness.  Doe denied that she had gone to the police for advice about "violence in the relationship," but she acknowledged she had gone for advice about "[a]rguing" and "[w]hat was right and wrong."  Doe indicated she had been mad at defendant for arguing, and she acknowledged that defendant had told her to look at him when he was talking to her, but she denied that defendant had hit her during the argument or taken her phone.  Doe also denied there had been any prior violence in the relationship, although there had been prior arguing.

Doe testified that she and defendant had lived together at defendant's mother's house for "[a]pproximately six months or something," but she did not know "exactly when."  Doe then clarified, "I don't know if you would consider that living because I would just spend the night, go home, take a shower."  Doe also kept clothing at

defendant's house.  She described "home" as her parents' house.  Ultimately, Doe agreed with the prosecutor that she lived part-time with defendant.

Doe admitted that she had been in contact with defendant since the time of his arrest, including talking to him numerous times on the phone.  Doe acknowledged listening to some of the recorded calls with an investigator, and one of the calls was played at the preliminary hearing.  Doe also admitted she had gone to visit defendant in jail.

On cross-examination, Doe testified that within about a week of the June 1, 2013 incident, she had caught defendant with another woman.  Referring to the recorded jail call that was played at the preliminary hearing, Doe testified that she was referring to her feelings when she told defendant that he had "hurt" her.  Doe agreed with defendant's trial counsel that specifically, she was "referring to the fact that he hurt [her] by being with" the other woman.  At that point, the trial court found that Doe was "so aligned with the defendant" that it would not allow any further leading questions by the defense on cross-examination.  The defense was allowed to "do a direct examination" instead.

On further questioning by defendant's trial counsel, Doe testified that during the jail phone call, she had apologized for "putting [defendant] in jail."  She could not recall if she had been in a physical altercation with anyone other than defendant in the days before his arrest.  When asked how she received the injuries, Doe testified, "Ran into a pole."

After the above testimony, Doe was excused subject to recall.  Officer Zuniga then testified about statements Doe made during his interview with her at the police station.  Doe told him that she had been physically assaulted by defendant and told him details of the argument that preceded the physical assault.

### E.    Domestic Violence Expert

Deborah Jacroux, a licensed marriage and family counselor, testified at trial.  She described the "[c]ycle of violence" that can exist in a relationship.  The cycle may begin

6

with a "honeymoon period," after which tension will build and "abusive emotional behavior" will occur. An act of violence may follow, and the cycle then repeats itself.

A person may stay in a relationship with such a dynamic for several reasons. The cycle may seem normal because the person has grown up in a family with the same dynamic. The abuser may apologize. The person may need financial support from the abuser. The honeymoon phase may give the person hope.

Victims of domestic violence often do not report the abuse because of fear of retaliation. Victims may also provide an initial report but then refuse to cooperate with law enforcement because they begin to feel guilty and worry about supporting their family.

### F. Charges, Pleas, Verdicts, and Sentence

Defendant was charged with inflicting corporal injury on a cohabitant (§ 273.5, subd. (a); count 1), possession of a concealed firearm by a person who had a prior felony conviction (§ 25400, subd. (a)(2); count 2), carrying a loaded firearm (§ 25850, subd. (a)); count 3), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 4), possession of ammunition by a felon (§ 30305, subd. (a)(1); count 5), resisting, obstructing, or delaying a peace officer (§ 148, subd. (a)(1); count 6), battery on a person with whom he had a dating relationship (§ 243, subd. (e)(1); count 7), and 20 counts of violating a protective order (§ 166, subd. (c)(1); counts 8-27). The information further alleged that defendant had a prior conviction of assault with a deadly weapon that qualified as a strike. (§ 1170.12, subd. (c)(1).)

A jury trial began on February 10, 2014. On February 13, 2014, defendant pleaded no contest to the firearm and ammunition counts (counts 2 through 5) and to resisting, obstructing, or delaying a peace officer (count 6). The jury subsequently convicted defendant of the remaining counts: corporal injury on a cohabitant (§ 273.5, subd. (a); count 1), battery on a person with whom he had a dating relationship (§ 243,

7

subd. (e)(1); count 7), and violating a protective order (§ 166, subd. (c)(1); counts 8-27). The trial court found true the strike allegation (§ 1170.12, subd. (c)(1)).

At the sentencing hearing held on April 4, 2014, the trial court imposed an aggregate prison term of seven years four months. The trial court imposed a three-year term for count 1, doubled to six years under the Three Strikes law, with a consecutive term of 16 months for count 2. The trial court stayed counts 3 through 5 pursuant to section 654, and it imposed concurrent 365-day terms for counts 6 through 27.

### III.    DISCUSSION

#### A.    *Admission of Doe's Prior Statements*

Defendant challenges the admission of Doe's prior statements—her 9-1-1 call, her statements to Officer Zuniga, and her preliminary hearing testimony—on a number of grounds. Defendant also challenges the admission of the jail phone calls.

#### 1.    **Proceedings Below**

The prosecution moved to admit Doe's preliminary hearing testimony pursuant to Evidence Code section 1291 [prior testimony] and Evidence Code section 1294 [prior inconsistent statements admitted in prior hearing]. The prosecution represented that Doe was unavailable under Evidence Code section 240 because she was avoiding service despite the exercise of due diligence. The prosecution also moved to admit Doe's 9-1-1 call pursuant to Evidence Code section 1280 [record by public employee] and Evidence Code section 1240 [spontaneous statement].

Defendant objected to the admission of Doe's prior statements as violating his Sixth Amendment right of confrontation. Defendant asserted that although he had cross-examined Doe at the preliminary hearing, his cross-examination had been cut short and thus it was not "complete and adequate." Defendant also argued that Doe's prior inconsistent statements were not admissible under Evidence Code section 1294 because Doe had not been confronted with those statements at the preliminary hearing. Defendant

8

further argued that the 9-1-1 call was testimonial and did not fall within a hearsay exception. Additionally, defendant moved to exclude the jail phone calls as hearsay and pursuant to Evidence Code section 352.

The trial court found that Doe was unavailable, that the defense had an "adequate and appropriate opportunity" to cross-examine Doe during the preliminary hearing, that Doe's preliminary hearing testimony and prior statements were admissible, and that the jail phone calls were non-testimonial and constituted admissions of a party opponent.

## 2. Testimonial Statements

Defendant first contends Doe's preliminary hearing testimony and statements to Officer Zuniga constituted testimonial hearsay that was inadmissible at trial because defendant did not have an adequate prior opportunity to cross-examine Doe at the preliminary hearing. We will apply the independent standard of review in analyzing this claim. (See *People v. Seijas* (2005) 36 Cal.4th 291, 304 [independent standard of review is applied to a claim that "affects the constitutional right of confrontation"].)

In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the high Court held that the term "testimonial," for purposes of the confrontation clause, "applies . . . to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations" (*id.* at p. 68) and that a victim's statement "knowingly given in response to structured police questioning" qualified as "testimonial" (*id.* at p. 53, fn. 4). The *Crawford* court further held that under the Sixth Amendment, "testimonial evidence" is inadmissible unless the witness is unavailable and the defendant had "a prior opportunity for cross-examination." (*Id.* at p. 68.) The critical question, for purposes of both the confrontation clause and the hearsay exception for former testimony (Evid. Code, § 1291) "is whether the previous opportunity for cross-examination was effective." (*People v. Jones* (1998) 66 Cal.App.4th 760, 766 (*Jones*).)

Defendant relies on *People v. Brock* (1985) 38 Cal.3d 180 (*Brock*) to support his claim that he did not have an adequate opportunity to cross-examine Doe at the

preliminary hearing.  In *Brock,* the witness was in the hospital at the time of her preliminary hearing, during which the prosecution introduced a prior statement the witness had made to police.  By the time the defendant cross-examined her, the witness's "condition had deteriorated to such an extent that defense counsel terminated his examination after only three questions."  (*Id.* at p. 186.)  By the time of trial, the witness had passed away, but the prosecution was permitted to introduce her preliminary hearing testimony, including the prior statement.

The California Supreme Court held that the trial court should not have permitted the prosecution to introduce the witness's preliminary hearing testimony.  The court noted that the witness's condition had "forced defense counsel to abandon significant opportunities to defeat introduction of her [prior] statement" and "foreclosed [him] from any attempt to develop aspects of [her] direct testimony and prior statements which were favorable to the defense."  (*Brock, supra,* 38 Cal.3d at p. 197.)  Moreover, the witness, who had made three prior inconsistent statements before the preliminary hearing, "was never confronted with the contradictions in her recollection or examined at all with respect to the substance of the three statements."  (*Ibid.*)  The witness had not adopted "one of the versions of events" or explained the inconsistencies, and thus, "the jury had no basis for determining which of the statements was true."  (*Ibid.*)

The instant case is distinguishable from *Brock*.  Here, Doe was not unable to answer questions at the preliminary hearing, and defendant was permitted to ask Doe an unlimited number of questions on cross-examination.  Although the defense was eventually precluded from asking Doe leading questions, that restriction was put into place because Doe's testimony was "aligned with the defendant."  Significantly, before the court imposed that restriction, Doe had already denied that defendant had committed any violence against her—that is, she had given valuable testimony favoring the defense.  Doe had also already explained why she had made up her initial allegations of violence (i.e., she had caught defendant with another woman), and she had explained that she was

10

merely referring to her feelings about defendant being with the other woman when she said that defendant had "hurt" her. Even after the restriction on cross-examination, Doe gave further testimony that was valuable to the defense, including attributing her injuries to running into a pole. Thus, unlike in *Brock,* Doe was confronted with the contradictions in her prior statements and was able to explain the inconsistencies. (See *Brock, supra,* 38 Cal.3d at p. 197.)

Defendant has not shown that his cross-examination of Doe at the preliminary hearing "would have been any more effective" had he not been required to ask Doe non-leading questions. (See *Jones, supra,* 66 Cal.App.4th at p. 768.) We therefore conclude that the trial court did not violate defendant's Sixth Amendment confrontation rights by admitting Doe's preliminary hearing testimony or her statements to Officer Zuniga into evidence.

### 3.    Doe's Prior Statements

Defendant next contends the trial court erred by admitting Doe's statements to Officer Zuniga pursuant to Evidence Code section 1294.[3] Defendant contends that in order for Doe's prior statements to be admitted at trial, a transcript or recording of Doe's prior statements had to have been introduced into evidence at the preliminary hearing.

---

[3] Evidence Code section 1294 provides: "(a) The following evidence of prior inconsistent statements of a witness properly admitted in a preliminary hearing or trial of the same criminal matter pursuant to [Evidence Code] Section 1235 is not made inadmissible by the hearsay rule if the witness is unavailable and former testimony of the witness is admitted pursuant to [Evidence Code] Section 1291: [¶] (1) A video recorded statement introduced at a preliminary hearing or prior proceeding concerning the same criminal matter. [¶] (2) A transcript, containing the statements, of the preliminary hearing or prior proceeding concerning the same criminal matter. [¶] (b) The party against whom the prior inconsistent statements are offered, at his or her option, may examine or cross-examine any person who testified at the preliminary hearing or prior proceeding as to the prior inconsistent statements of the witness."

11

Defendant relies on *People v. Martinez* (2003) 113 Cal.App.4th 400 (*Martinez*). In *Martinez,* the court explained that Evidence Code section 1294 was enacted to allow " 'the statement of a person, who is unavailable as a witness, to be introduced as evidence in court if the statement was previously introduced at a hearing or trial as a prior inconsistent statement of the witness.' [Citations.]" (*Martinez, supra,* at pp. 408-409.)

*Martinez* involved the admission of a recorded statement by a non-testifying accomplice to the police. The accomplice had testified at the preliminary hearing but was found unavailable for trial. The *Martinez* court held that the trial court should not have permitted the jury to hear the recording of the accomplice's statement to the police, because no transcript or a recording of that statement had been introduced as evidence at the preliminary hearing. (*Martinez, supra,* 113 Cal.App.4th at p. 409.)

As the Attorney General contends, defendant failed to raise this specific point below. (See Evid. Code, § 353, subd. (a) [a timely objection or motion on a "specific ground" is a prerequisite for asserting error concerning the admission of evidence].) In the trial court, defendant asserted that Doe's statements to Officer Zuniga were inadmissible because Doe was not "confronted with the prior inconsistent statement" at the preliminary hearing. Defendant is now raising a different argument—that a transcript or recording of Doe's prior inconsistent statement had to have been introduced at the preliminary hearing.

In this case, Doe's statements to Officer Zuniga were introduced as prior inconsistent statements at the preliminary hearing, through Officer Zuniga's testimony. The statements were introduced through Officer Zuniga's testimony at trial as well. Had defendant objected at trial, the prosecution could have presented Doe's prior inconsistent statements through the transcript of Officer Zuniga's preliminary hearing testimony. Under the circumstances, the forfeiture rule applies because without an objection, the prosecution had no such "opportunity to cure the defect." (See *People v. Coleman* (1988) 46 Cal.3d 749, 777.)

12

### 4.     Instruction on Prior Statements

Defendant contends Doe's statements to Officer Zuniga were admissible only as impeachment of Doe's preliminary hearing testimony and that, therefore, the trial court erred by instructing the jury that those statements were admissible for their truth.

Pursuant to CALCRIM No. 318, the trial court instructed the jury: "You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways. First, to evaluate whether the witness's testimony in court is believable; and second, as evidence that the information in those earlier statements is true."

Defendant did not object to this instruction in the trial court or request that the trial court give an alternative instruction. Defendant argues, however, that this court should not find the issue forfeited. Defendant cites section 1259, which permits the appellate court to "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." We will assume that the asserted error affected defendant's substantial rights and address the merits of his claim.

Defendant acknowledges that Evidence Code section 1235 permits a witness's prior inconsistent statement to be used as substantive evidence. (See *People v. Johnson* (1992) 3 Cal.4th 1183, 1219.) Defendant points out that Evidence Code section 1235 applies only to a witness at trial, not to a hearsay declarant.[4] Defendant cites *People v. Blacksher* (2011) 52 Cal.4th 769 (*Blacksher*), in which the court held that statements of a hearsay declarant that are admitted to attack the declarant's credibility under Evidence

---

[4] Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his [or her] testimony at the hearing and is offered in compliance with [Evidence Code] Section 770."

13

Code section 1202[5] are not admissible for their truth if the declarant does not testify at trial. (*Blacksher, supra,* at p. 808.) However, the *Blacksher* court did not consider whether a statement admitted pursuant to Evidence Code section 1294 is admissible for its truth, so that case is not helpful.

The Attorney General points out that Evidence Code section 1294 provides that evidence of prior statements made at a preliminary hearing is "not made inadmissible by the hearsay rule," without using qualifying language such as "for the purpose of attacking the credibility of the declarant," which is used in Evidence Code section 1202. The Attorney General points out that the relevant language of Evidence Code section 1294 is thus "identical" to the language of Evidence Code section 1235, which permits prior inconsistent statements to be considered for their truth.

We agree with the Attorney General that under principles of statutory interpretation, evidence admitted under Evidence Code section 1294 may be considered for its truth. " 'It is an established rule of statutory construction that similar statutes should be construed in light of one another [citations], and that when statutes are *in pari materia* similar phrases appearing in each should be given like meanings. [Citations.]' [Citation.]" (*People v. Lamas* (2007) 42 Cal.4th 516, 525.)

In providing that evidence of a prior inconsistent statement admitted at a preliminary hearing "is not made inadmissible by the hearsay rule"—without qualification—in Evidence Code section 1294, the Legislature used identical language to that in Evidence Code section 1235, which permits a prior inconsistent statement of a

---

[5] Evidence Code section 1202 provides in pertinent part: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he [or she] is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."

witness to be considered for its truth. Thus, evidence admitted pursuant to Evidence Code section 1294 may also be considered for its truth. This construction of the statute also comports with the apparent intent of the Legislature in enacting Evidence Code section 1294 and makes logical sense. The Legislature could not have intended that prior inconsistent statements admitted as substantive evidence at the preliminary hearing (pursuant to Evidence Code section 1235) not be admissible as substantive evidence at trial. (See *Martinez, supra,* 113 Cal.App.4th at p. 409 ["Evidence Code section 1294 appears to have been designed to overcome the admissibility problems associated with out-of-court statements which are inconsistent with an unavailable witness's former testimony"]; *id.* at p. 411 [error in admitting recording of unavailable witness's statement to the police was harmless where witness's other prior inconsistent statements were admitted at trial through preliminary hearing testimony of officer].)

We conclude the trial court did not err by instructing the jury that Doe's statements to Officer Zuniga were admissible for their truth as well as for impeachment of her preliminary hearing testimony.

### 5. 9-1-1- Call

Defendant contends Doe's 9-1-1 call was inadmissible testimonial hearsay under *Crawford, supra,* 541 U.S. 36 and that the call was not admissible as a spontaneous statement under Evidence Code section 1240.

As described above, Doe called 9-1-1 and told the dispatcher she wanted to report "a domestic violence." She reported that the incident had been "very physical" and that she had bruises on her face. Doe said she did not need an ambulance, explaining, "I'm fine. A little shaken up, that's all." When asked when the incident had occurred, Doe responded, "Today, earlier today. It's . . . it's been . . . it's been happening off and on, and I never really reported it." She named defendant as the perpetrator and began crying. Doe explained that she and defendant had been arguing, and that defendant had "just

15

started hitting [her]" while they were in his sister's car. Doe continued crying as she described the incident.

### a. The 9-1-1 Call Was Not Testimonial

In *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*), the United States Supreme Court held that an interrogation that took place during a 9-1-1 call did not produce testimonial statements. The court explained that a 9-1-1 call "is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Id.* at p. 827.) In that particular case, several factors supported a finding that the victim's statements to the 9-1-1 dispatcher were, indeed, non-testimonial. First, the victim was "speaking about events *as they were actually happening,* rather than 'describ[ing] past events,' [citation]." (*Ibid.*) Second, the victim's statements indicated she was "facing an ongoing emergency" rather than "provid[ing] a narrative report of a crime absent any imminent danger." (*Ibid.*) Third, the questions that resulted in the elicited statements were those "necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past." (*Ibid.*) Fourth, the victim provided "frantic answers" rather than calm responses, "in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." (*Ibid.*) Because the circumstances objectively indicated that the primary purpose of the 9-1-1 "was to enable police assistance to meet an ongoing emergency," the victim's statements during the call were not testimonial. (*Id.* at p. 828.)

Defendant contends that in this case, the 9-1-1 call was testimonial because there was no ongoing emergency or threat, and because Doe was already at the police station—a place of safety—at the time she made the call.

Similar arguments were rejected in *People v. Saracoglu* (2007) 152 Cal.App.4th 1584 (*Saracoglu*). In that case, the victim went to the police station following an assault by the defendant, which involved choking, pushing, hitting, and a threat to kill the victim if she went to the police. Officers responded to the police station and spoke with the

16

victim, who was "nervous, crying and shaking" as she described the incident. (*Id.* at p. 1587.) The defendant argued that the victim's statements were testimonial. He pointed out that the interview occurred about 30 minutes after the incident and argued that " 'there was no ongoing emergency and there was no imminent threat of danger' " because the victim was " 'in the safety of the police station.' " (*Id.* at p. 1596.)

The *Saracoglu* court held that the victim's trip to the police station was "the functional equivalent of making a 911 call" under the circumstances. (*Saracoglu, supra,* 152 Cal.App.4th at p. 1597.) The court further held that the emergency was ongoing despite the fact the victim had gone to the police station, explaining: "The safety of the station house was only temporary because [the victim] could not go home again until the situation was resolved." (*Ibid.*) Moreover, the emergency was ongoing because the defendant had threatened to kill the victim if she went to the police. (*Ibid.*) The court concluded that the victim's statements were non-testimonial: "Objectively viewed, the primary purpose of [the victim's] initial interrogation by [an officer] was 'to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial.' [Citation.]" (*Ibid.*)

Objectively viewed, the circumstances of the instant case indicate that the purpose of the 9-1-1 call was "not to establish or prove past facts for possible criminal use," but to help the 9-1-1 dispatcher respond to an ongoing emergency. (See *People v. Cage* (2007) 40 Cal.4th 965, 986.) Although Doe went to the police station to make the 9-1-1 call, the police station was closed and thus was not necessarily a place of safety. Moreover, Doe went to the police station to make the call because defendant had taken her phone, leaving her without a means of obtaining immediate assistance. The incident had ended less than 15 minutes before the 9-1-1 call, and defendant had only left to get cigarettes, so it was likely he would have returned soon had Doe not gone to the police station. The fact that Doe cried throughout the 9-1-1 call indicated that her call "was plainly a call for help against a bona fide physical threat." (*Davis, supra,* 547 U.S. at p. 827.) During the

call, the dispatcher did no more than "elicit[] the information he [or she] needed to understand [Doe's] situation and to take action 'to *resolve* the present emergency.' [Citation.]" (*Saracoglu, supra,* 152 Cal.App.4th at p. 1598.)

We conclude Doe's 9-1-1 call was not testimonial and thus not made inadmissible by the confrontation clause of the Sixth Amendment.

### b. The 9-1-1 Call was Admissible as a Spontaneous Statement

Under Evidence Code section 1240, "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶]  (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and  [¶]  (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

Defendant contends that Doe's 9-1-1 call was not spontaneous because it was made after Doe showed her injuries to defendant's sister and went to the police station. He argues "there was ample time for Doe to contrive the statements she made when she called 911."

"The decision to admit evidence under Evidence Code section 1240 is reviewed for abuse of discretion.  [Citation.]" (*Saracoglu, supra,* 152 Cal.App.4th at p. 1588.) In *Saracoglu,* the court found the victim's statements spontaneous even though the incident had occurred about 30 minutes earlier, noting that "[m]uch longer periods of time have been found not to preclude application of the spontaneous utterance hearsay exception.  [Citations.]" (*Id.* at p. 1589.)  The *Saracoglu* court also held that the victim's statements were made while she was still under the stress of excitement, rather than after an opportunity to deliberate and reflect, and despite the fact the statements were made in response to police questioning.  (*Id.* at pp. 1589-1590.)  The court explained, "The crucial issue is the declarant's mental state and the evidence shows [the victim] was quite distraught; when [the officer] initially encountered her at the police station, she was crying, shaking and fearful." (*Id.* at p. 1590.)

18

In the instant case, only about 15 minutes had passed since the incident had ended. Based on Doe's demeanor and statements, the trial court could reasonably find that she was still under the stress of excitement when she called 9-1-1. We find no abuse of discretion in the trial court's determination that the 9-1-1 call was admissible under Evidence Code section 1240.

### 6. Jail Calls

Defendant contends the phone calls between defendant and Doe were inadmissible hearsay and more prejudicial than probative under Evidence Code section 352.

As detailed above, transcripts from several of the jail calls were introduced into evidence. In one call, defendant suggested that Doe could have told the police that her injuries were due to another woman instead of him. Defendant apologized and acknowledged that he had "made a mistake." After Doe referred to what defendant had done to her face and asked why he had hurt her, defendant responded, "Because I love you so much, and it hurts me." In another call, Doe told defendant that she had gone to the police station after the incident because she was tired of him hitting her. Defendant failed to explain or deny her accusations. Defendant similarly failed to explain or deny Doe's accusations in another call, during which she claimed she was scared and "tired of getting beat up" by him and tired of him hitting her.

#### a. *Evidence Code sections 1220 and 1221*

Defendant acknowledges that his own statements in the jail phone calls were "potentially admissible" under Evidence Code section 1220, which permits introduction of admissions by a party, and he presents no argument on that issue.[6] Defendant further

---

[6] Evidence Code section 1220 provides: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he [or she] is a party in either his [or her] individual or representative capacity, regardless of whether the statement was made in his [or her] individual or representative capacity."

19

acknowledges that if he adopted any of Doe's statements by his words or conduct, those statements could be admissible under Evidence Code section 1221, which permits evidence of adoptive admissions.[7] Defendant argues, however, that he did not adopt any of Doe's statements.

We review the trial court's ruling for abuse of discretion. (*People v. Chism* (2014) 58 Cal.4th 1266, 1297 (*Chism*).) Under Evidence Code section 1221, " 'If a person is accused of having committed a crime, under circumstances which fairly afford him [or her] an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he [or she] was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he [or she] fails to speak, or he [or she] makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' [Citations.] . . . 'When a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His [or her] silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.)

In this case, defendant's responses to Doe's accusations during the jail phone calls included direct admissions as well as evasive responses, which under the circumstances "manifested his adoption of" those accusations. (*Chism, supra,* 58 Cal.4th at p. 1297.)

---

[7] Evidence Code section 1221 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his [or her] adoption or his [or her] belief in its truth."

20

The trial court therefore did not abuse its discretion by determining that Doe's statements during the jail phone calls were admissible under Evidence Code section 1221.

        b.       *Evidence Code section 352*

Defendant contends that even if the jail phone calls were admissible under Evidence Code sections 1220 and 1221, the trial court erred by declining to exclude them pursuant to Evidence Code section 352.[8] Specifically, defendant contends the trial court failed to demonstrate that it "properly weigh[ed] the probative value against the potential for undue prejudice."

" '[W]hen ruling on a [Evidence Code] section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state that it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under . . . [Evidence Code] section 352.' [Citations.]" (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315 (*Jennings*).) Thus, a trial court is not required "to articulate its consideration of each of a list of particular factors of probability and prejudice in making a decision under [Evidence Code] section 352." (*Ibid.*)

In this case, defendant sought to exclude the jail phone calls during motions in limine, expressly referencing Evidence Code section 352. During the hearing on motions in limine, the trial court expressly indicated it understood that defendant was seeking to exclude the jail phone calls based on "undue prejudice under [Evidence Code section] 352." The trial court later found that the jail phone calls were "relevant" and "admissible." This record thus demonstrates that " 'the trial court understood and

---

[8] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

fulfilled its responsibilities under . . . [Evidence Code] section 352.'  [Citations.]" (*Jennings, supra,* 81 Cal.App.4th at p. 1315.)

The trial court also did not abuse its discretion by determining that the probative value of the jail phone calls was not substantially outweighed by the probability that the calls would create a substantial danger of undue prejudice.  (See *People v. Suff* (2014) 58 Cal.4th 1013, 1066.)  " 'For purposes of Evidence Code section 352, evidence is considered unduly prejudicial if it tends to evoke an emotional bias against the defendant as an individual and has a negligible bearing on the issues.'  [Citation.]"  (*Id.* at p. 1073.)  The jail phone calls had significant probative value in explaining why Doe changed her story by the time of the preliminary hearing, as they showed the relationship dynamic between Doe and defendant.  The jail phone calls also had significant probative value because they contained defendant's adoptive admissions regarding the charged offenses.  Contrary to defendant's claim, the fact that defendant was in jail at the time of the calls was not so irrelevant or prejudicial as to outweigh the probative value of the calls, particularly since the jury was instructed, pursuant to CALCRIM No. 220, that it must not be biased against defendant just because he was arrested and charged with a crime.  And although in one phone call Doe's comments could be construed as a reference to a concern or prior threat that defendant would kill her, defendant never sought to redact that transcript despite the trial court's indication that it would consider an Evidence Code section 352 argument as to specific statements in the calls.

In sum, we conclude the trial court did not err by admitting the jail phone calls into evidence.

### B. Sufficiency of the Evidence – Cohabitation

Defendant contends there was insufficient evidence to support the jury's finding that Doe was a "cohabitant" of defendant. (See § 273.5, subd. (b)(2).)[9]

"The law we apply in assessing a claim of sufficiency of the evidence is well established: ' " ' "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' [Citation.] . . . 'We presume " 'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294 (*Gonzales*).)

The jury in this case was instructed on the definition of the term "cohabitants" pursuant to CALCRIM No. 840 as follows: "The term 'cohabitants' means two unrelated persons living together for a substantial period of time, resulting in some permanency of the relationship. [¶] Factors that may determine whether people are cohabiting include, but are not limited to: [¶] One, sexual relations between the parties while sharing the same residence; two, sharing of income or expenses; three, joint use or ownership of property; four, the parties holding themselves out as husband and wife; five, the continuity of the relationship; and six, the length of the relationship. [¶] A person may cohabitate simultaneously with two or more people at different locations during the same

---

[9] Section 273.5, subdivision (b) lists several categories of persons who can be a "victim" for purposes of subdivision (a): "(1) The offender's spouse or former spouse. [¶] (2) The offender's cohabitant or former cohabitant. [¶] (3) The offender's fiancé or fiancée, or someone with whom the offender has, or previously had, an engagement or dating relationship . . . . [¶] (4) The mother or father of the offender's child."

In this case, the jury was instructed that defendant was charged with inflicting corporal injury specifically "on his current or former cohabitant."

time frame if he or she maintains substantial ongoing relationship with each person and lives with each person for significant periods."

The above definition of "cohabitants" is taken from *People v. Holifield* (1988) 205 Cal.App.3d 993, 1001 (*Holifield*) and *People v. Moore* (1996) 44 Cal.App.4th 1323, 1335 (*Moore*). In each case, the appellate court upheld a jury's finding of cohabitation.

In *Holifield*, the defendant stayed with the victim off and on for three months. (*Holifield, supra,* 205 Cal.App.3d at p. 996.) The defendant "took his clothes and other belongings with him each time he left," and the couple "did not share rent, have a joint bank account, make joint purchases or hold themselves out as husband and wife." (*Ibid.*) The couple had " 'infrequent' " sex, and the victim described their relationship as "friends and roommates," though she had romantic feelings for the defendant. (*Ibid.*) The appellate court concluded that the evidence established "an intimacy going well beyond that of ordinary roommates," which was sufficient to support the jury's finding. (*Id.* at p. 1002.)

In *Moore*, the defendant and the victim were involved in a sexual relationship for several years, they shared a lease on an apartment, and even after the defendant began spending a significant amount of time with other girlfriends, he retained a key to the apartment, kept his possessions there, and continued to have an intimate relationship with the victim. (*Moore, supra,* 44 Cal.App.4th at p. 1335.) The appellate court found that the defendant had maintained a "substantial relationship" with the victim, which was sufficient to support a finding of cohabitation. (*Ibid.*)

A finding of cohabitation under section 273.5, subdivision (a) was also upheld in *People v. Taylor* (2004) 118 Cal.App.4th 11 (*Taylor*). In that case, at the time of the charged incident, the defendant and victim had been dating for about five months, and the victim was 10 weeks pregnant with the defendant's child. (*Id.* at p. 17.) The victim was homeless and living with the defendant in his car. She testified that she had been staying with her aunt " 'for a little while,' " but she would leave, meet up with defendant,

24

and then " 'just be with him for a while.' " (*Ibid.*) The *Taylor* court explained, "Taken in their totality, these facts were sufficient to establish that [the victim and defendant] were living together in a substantial relationship that was characterized by permanence and sexual or amorous intimacy. [Citation.]" (*Id.* at p. 19.) The court noted that section 273.5 protected the couple despite the fact that their "living arrangements may have been unstable or transitory," and despite the fact that they "sometimes lived separately with other relatives." (*Ibid.*)

In this case, Doe testified that she and defendant had lived together at defendant's house for "[a]pproximately six months or something," but she did not know "exactly when." Doe then clarified, "I don't know if you would consider that living because I would just spend the night, go home, take a shower." Doe also kept clothing at defendant's house. She described "home" as her parents' house. Ultimately, Doe agreed with the prosecutor that she lived part-time with defendant.

Under the case law discussed above, the evidence here—viewed in the light most favorable to the judgment (see *Gonzales, supra,* 52 Cal.4th at p. 294)—was sufficient to support the jury's finding of cohabitation under section 273.5, subdivision (a) in accordance with the instruction given. Doe testified she had known defendant for about a year and had been living with him for six months. This was a "substantial period of time, resulting in some permanency of the relationship," within the meaning of CALCRIM No. 840. Doe also testified that she would spend the night at defendant's residence, take showers there, and keep clothing there—factors that supported a finding of cohabitation. Contrary to defendant's argument, the prosecution was not required to elicit evidence that Doe maintained only one residence, kept her belongings at defendant's home, used defendant's address for mail, or paid for rent or utilities. (See *Holifield, supra,* 205 Cal.App.3d at p. 996; see also *People v. Belton* (2008) 168 Cal.App.4th 432, 438 [evidence that victim and defendant did not share living expenses did not preclude a finding of cohabitation].)

25

We conclude that substantial evidence supported the jury's finding that defendant and Doe were cohabitants at the time of the charged offenses.

### C.    *Sufficiency of the Evidence – Strike Allegation*

Defendant contends there was insufficient evidence to support the trial court's finding that defendant's prior conviction of assault, in violation of former section 245, subdivision (a)(1), was a strike.  Defendant argues that the record of his prior conviction does not provide substantial evidence to support a finding that the conviction was under the "deadly weapon" prong of former section 245, subdivision (a)(1) rather than the "by means of force likely to produce great bodily injury" prong.  (See *People v. Delgado* (2008) 43 Cal.4th 1059, 1065 (*Delgado*).)  Our review of this issue is performed by examining the record "in the light most favorable to the judgment to ascertain whether it is supported by substantial evidence."  (*Id.* at p. 1067.)

#### 1.    Evidence

The evidence submitted in support of the strike allegation consisted of documents from the record of defendant's prior conviction, including an information, a minute order from the change of plea hearing, and an abstract of judgment.

The information alleged that on June 24, 2002, defendant committed "assault by means of force likely to produce great bodily injury or with deadly weapon and instrument in violation of Section 245(a) (1) of the Penal Code," specifying that defendant "did willfully and unlawfully commit an assault upon [the victim], with a deadly weapon, to wit, screwdriver, and by means of force likely to produce great bodily injury."  (Capitalization omitted.)

The minute order from the change of plea hearing held on September 26, 2002 indicates that defendant entered a no contest plea to "ADW or assault w/force likely to produce GBI" and contains the following notation:  "The defendant understands that the crime he/she is pleading to is a 'serious' or 'violent' felony, and as such is a 'strike' under the three strikes law."  (Capitalization omitted.)

26

The abstract of judgment indicates defendant was convicted of a violation of former section 245, subdivision (a)(1) and describes that offense as "ADW or Assault w/Force Likely to Produce GBI."

## 2.    Analysis

In 2002, section 245, subdivision (a)(1) made it a felony offense to "commit[ ] an assault upon the person of another with a deadly weapon or instrument other than a firearm *or* by any means of force likely to produce great bodily injury."  (Stats. 1999, ch. 129, § 1, italics added.)[10]

"[A]ssault with a deadly weapon" is a serious felony (§ 1192.7, subd. (c)(31)) that qualifies as a strike (§ 1170.12, subd. (b)(1)).  A crime in which the defendant "personally inflicts great bodily injury on any person" (§ 1192.7, subd. (c)(8)) is also a serious felony and thus a strike.  However, "assault merely by *means likely to produce* GBI [great bodily injury], without the additional element of personal infliction, is not included in the list of serious felonies.  Hence, . . . a conviction under the deadly weapon prong of [former] section 245(a)(1) is a serious felony, but a conviction under the GBI prong is not." (*Delgado, supra,* 43 Cal.4th at p. 1065.)  "[I]f . . . the record of the conviction does not disclose how the offense was committed, a court must presume the conviction was for the least serious form of the offense.  [Citations.]" (*Id.* at p. 1066.)

The shorthand description of a former section 245, subdivision (a)(1) conviction contained in an abstract of judgment was held insufficient to prove the underlying conduct in *People v. Banuelos* (2005) 130 Cal.App.4th 601 (*Banuelos*).  The abstract described the crime as " 'ASSAULT GBI W/DEADLY WEAPON.' " (*Id.* at p. 605.)

---

[10] Section 245 has since been amended.  Subdivision (a)(1) now references only the crime of "assault . . . with a deadly weapon or instrument other than a firearm," and subdivision (a)(4) now references only "assault . . . by any means of force likely to produce great bodily injury."  (See Stats. 2011, ch. 183, § 1.)

27

The *Banuelos* court found that the abstract did not prove that the defendant had used a deadly weapon in the prior conviction, rather than committing the assault by some other means of force likely to produce great bodily injury. (*Id.* at p. 606.) The court reasoned that the notation was ambiguous: while it "could be read to mean that the assault was committed both by means of force likely to produce great bodily injury *and* with a deadly weapon, it could also be construed as a shorthand description of the criminal conduct covered by [former] section 245, subdivision (a)(1) – assault by means of force likely to product great bodily injury *or* with a deadly weapon." (*Ibid*.) The court found no substantial evidence "that a deadly weapon was in fact used during the commission of that offense." (*Ibid.*)

In *Delgado*, the California Supreme Court upheld a strike finding based on the shorthand description of a former section 245, subdivision (a)(1) conviction contained in an abstract of judgment. In that case, "[t]he abstract specified the statute violated as '[Penal Code section] 245(A)(1)' and described the crime as 'Asslt w DWpn.' " (*Delgado, supra,* 43 Cal.4th at p. 1063.) The notation on the abstract contained no reference to the great bodily prong of former section 245, subdivision (a)(1). The *Delgado* court held that the abstract provided substantial evidence to support the trial court's finding that the prior conviction was for assault with a deadly weapon and thus that it qualified as a strike. (*Id.* at p. 1069.) The *Delgado* court observed that one way to ensure that "the serious felony nature of [an] offense" becomes "an explicit part of the record of conviction" is if the accusatory pleading specifies that a charged offense involves facts making it a serious felony. (*Id.* at p. 1072.) The court encouraged the use of such a procedure. (*Ibid.*)

In this case, the abstract of judgment indicates defendant was convicted of a violation of former section 245, subdivision (a)(1) and describes that offense as "ADW or Assault w/Force Likely to Produce GBI." Thus, like in *Banuelos,* the abstract here is ambiguous as to whether defendant's conviction was under the deadly weapon prong or

28

force likely prong of former section 245, subdivision (a)(1). However, other documents comprising the record of the prior conviction provide substantial evidence to support the trial court's finding "that a deadly weapon was in fact used during the commission of that offense." (See *Banuelos, supra,* 130 Cal.App.4th at p. 606.) First, the accusatory pleading—the information—did specify that the charged offense involved facts making it a serious felony, i.e., one involving use of a deadly weapon. The information alleged that in committing the assault, defendant used "a deadly weapon, to wit, screwdriver." (Capitalization omitted.) Additionally, the minute order from the change of plea hearing held on September 26, 2002 indicates that, on the record, defendant acknowledged "that the crime he/she is pleading to is a 'serious' or 'violent' felony, and as such is a 'strike' under the three strikes law." (Capitalization omitted.)

We conclude there was sufficient evidence to support the trial court's finding that defendant's prior conviction of assault, in violation of former section 245, subdivision (a)(1), was a strike.

## IV.    DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

ELIA, ACTING P.J.

_____

MIHARA, J.